## UNITED STATES v. ALLIS.

(Circuit Court, E. D. Kansas. December 8, 1893.)

1. NATIONAL BANKS—VIOLATION OF LAWS—FALSE ENTRIES IN BOOKS AND RE-
PORTS.

The "false entry" in the books or reports of a bank, which is punishable
under Rev. St. § 5209, is an entry that is knowingly and intentionally false
when made. It is not the purpose of the statute to punish an officer who,
through honest mistake, makes an entry in the books or reports of the
bank which he believes to be true, when it is in fact false.

2. SAME—PRESUMPTION.

If a president or cashier makes a false entry in a report of the condition
of the bank to the comptroller of the currency, the jury are authorized to
presume, from the false entry itself, in the absence of any explanation or
of any other testimony, that he knew it to be false. This presumption re-
sults from the fact that it is the duty of the officer who verifies the report
to know the condition of the bank, and, if the report is false, there is a
prima facie presumption that he knew it.

3. SAME—REQUISITES OF THE OFFENSE.

A false entry, either in the books of the bank or in a report of its con-
dition, is punishable only when the jury find that it was made by the de-
fendant, or by his direction, with the intent, either (1) to injure or defraud
the bank, or some other corporation, or some firm or person; or (2)
to deceive some officer of the bank; or (3) to deceive some agent appointed
or thereafter to be appointed to examine the affairs of the bank. If any
one of these intents is present, the offense is complete.

4. SAME—PRESUMPTION OF INTENT.

Where an entry in the books or in a report of the bank's condition is in
fact false, the jury are authorized to infer, from the false entry itself, an
intent of the defendant to injure or defraud the bank, or some other cor-
poration or individual, or to deceive some officer of the association, or an
agent appointed to examine into the condition of the bank, if such would
be the natural and probable consequence of the false entry.

5. SAME—FALSE ENTRY BY SUBORDINATE.

A false entry, made in the books or reports of a bank by a clerk, book-
keeper, or other subordinate employé, by the command or direction of the
president of the bank, is a false entry made by the president; and he is
liable to punishment for it, if he gives the direction knowing the entry
to be false, or with the intent to defraud, deceive, etc.

6. SAME.

If a false entry in the books or reports is made with a criminal intent,
it is no defense that another false entry is also made, which offsets the
former entry, with a like intent; but changes of this character are not as
strong evidence of an intent to injure or defraud the bank, or to deceive
its officers or examiners, as false entries which enable the officer making
them to withdraw the funds of the bank without consideration.

7. SAME—FALSE REPORT OF OVERDRAFTS—INTENT.

Every overdraft, whether made by previous arrangement or not, whether
secured or not, and whether drawing interest or not, is a loan, and is re-
quired by the law and the rules prescribed by the comptroller to be listed
and reported as an overdraft. It is, therefore, no defense, to a charge of
false entries in respect to overdrafts, that they had been arranged for or
secured, or that interest was to be paid upon them by agreement, if such
false entries were made with a criminal intent; but, in determining the
intent, the jury may consider the testimony of defendant that he con-
sidered the overdrafts as loans.

8. SAME—DEFENSES.

If the president of a bank makes or causes to be made false entries in
its books, or in reports to the comptroller, with the intent to deceive or
defraud, etc., it is no defense that he struggled to save the bank from fail-

ure, and to provide money to pay its depositors, by sacrificing his own property and borrowing money from others.

9. CRIMINAL LAW—DELIBERATIONS OF JURY.

If much the larger number of the jury are for conviction, a dissenting juror should consider whether a doubt in his own mind is a reasonable one, which makes no impression upon the minds of others equally honest and equally intelligent with himself, who have heard the same evidence with an equal desire to arrive at the truth, and under the sanction of the same oath. On the other hand, if a majority are for acquittal, the minority ought seriously ask themselves whether they may not reasonably, and ought not to, doubt the correctness of a judgment which is not concurred in by most of those with whom they are associated, and to distrust the weight and sufficiency of that evidence which fails to carry conviction to the minds of their fellows.

This was an indictment against Horace G. Allis for violation of Rev. St. § 5209, in making false entries in the books of a national bank and in reports to the comptroller of the currency of the condition of the bank.

Joseph W. House, Dist. Atty., and J. H. Harrod, for the United States.

Martin & Murphy and John Johnson, for defendant.

SANBORN, Circuit Judge (charging jury). One of the chief characteristics of a good government is the sure and speedy administration of justice. No government can long endure, or ought long to endure, under which the criminal is not speedily and certainly punished, and the innocent as speedily and certainly acquitted and protected. Laws are enacted for the protection of the lives, liberty, and property of the citizen. Penalties are prescribed for their violation, that this protection may be insured. Every good citizen withholds his own hand from the infliction of punishment, and appeals to the courts his government has established to right his wrongs and to enforce the laws enacted for his protection. Nor is the action of the government or its officers, in prosecuting those that they honestly believe to be guilty, properly subject to any adverse criticism or animadversion; nor has there been, so far as I have observed, anything in their conduct in this case that has even savored of persecution or unfairness. If the government has money and officers at its command, and uses them to properly gather and present the evidence against one whom its officers believe to be guilty of a violation of our laws, we ought not, on that account, to be resentful or prejudiced against it; but we should be grateful that we live under a government that has the power and disposition to punish the guilty, for it is only by the punishment of the guilty that the lives, liberty, and property of innocent citizens are preserved. If the courts and juries discharge the duties the law imposes upon them, if with courage and impartiality they punish the guilty and acquit the innocent, contentment and satisfaction and domestic peace prevail. But if they fail in the discharge of these duties; if criminals escape their just punishment, and the innocent are needlessly imperiled; if the property, lives, and liberty of the citizens go unprotected, because the laws are not enforced by juries and the courts,—every man, despairing of obtaining justice through

them, will feel disposed to avenge his own wrongs, and domestic violence and the barbaric rule of the strongest will soon again prevail.

We now come, gentlemen of the jury, to the discharge of one of the most important duties that will ever devolve upon us as citizens. We must determine whether the prisoner at the bar is guilty or innocent of a violation of the laws of this land. We have all, court and jury alike, taken a solemn oath to discharge this duty without fear or favor, according to the law and the evidence. In the discharge of this duty, the court and the jury have different parts to perform; but the honest and faithful discharge of their duties, and the attainment of a just result from this trial, demand of the court the same courage, integrity, impartiality, and zealous determination to do exact justice, regardless of the consequences to the parties, which I have no doubt animate the jury, and will inspire and direct their action. It is the duty of the court to declare to you the law by which this case must be determined, and it is your duty to be governed by that declaration. It is your exclusive province and duty to determine the issues of fact here presented, and the weight and credibility of the testimony of the witnesses, and by your determination of these questions the court will be bound. If, in the course of what the court may say to you, any expression of opinion should drop as to the disputed issues of fact, or the credibility of the testimony of the witnesses, you are not bound by any such expression; but it is your privilege to adopt or disregard it as you may see fit. You are, I repeat, the sole judges of the disputed questions of fact yet to be decided.

The defendant is charged by the government with the commission of heinous crimes. He is presumed to be innocent until his guilt is proved. The burden is on the government to prove the charges it has made. Not only this, but before the defendant can be found guilty of any offense, that offense must be proved by the evidence beyond a reasonable doubt. A reasonable doubt is a doubt founded on a consideration of all the testimony, and based on reason,—such a doubt as would deter a reasonably prudent man from acting or deciding in the most important matters involving his personal interests. If you have such a doubt of the guilt of the defendant under any of the counts of this indictment, after carefully considering all the evidence, you should acquit him of the offense charged in that count; but if you have no such doubt, but are morally certain he is guilty of the offense charged in any count of the indictment, you should fearlessly declare him guilty. It is not necessary, however, that you should be satisfied beyond all possibility or suspicion of doubt that the defendant was guilty before you can convict. Doubts that are not based upon a reasonable and careful consideration of all the evidence, but are purely imaginary, or born of sympathy alone, or of the ingenious suggestions of counsel merely, ought not to be considered, and should not influence your verdict. Possible, imaginary, and sympathetic doubts have no proper place in your deliberations; and if, in your opinion, the offense charged in any count in the indictment is proved beyond

a reasonable doubt, you should return a verdict in favor of the government on that count, regardless of all other doubts.

In a more primitive state of society, men generally kept their money and personal property in their own possession; but in our day it has long been the habit of men of all classes to intrust their money and securities to others for safe-keeping. Banks have been established in the large cities, protected by an efficient police and by secure vaults against the stealth of the thief and the force of the robber, and in these the moneys and securities of the business man and of the capitalist, and the surplus money of the farmer, the mechanic, and the laborer are alike deposited, in the faith that their directors and officers will faithfully preserve and honestly return these deposits, or their equivalent, when called for. A portion of the moneys thus deposited is, in the usual course of business, used to discount commercial paper of the customers of the bank, or to loan to them upon their promissory notes, while a sufficient balance is kept on hand to pay depositors as they call. It is obvious that, under this system, the security of the moneys of the depositors, the interests of the stockholders and the creditors of any bank, and its very existence must depend almost entirely upon the honesty, integrity, care, and prudence of its officers. As the money is in their hands, they can, by a breach of trust and honor, appropriate it to their own use, or to the use of their friends, or, by carelessness and imprudence, they may loan it to worthless borrowers, until it is irrevocably lost. To prevent the possibility of such crimes and misfortunes, as far as possible, is one of the objects of the existence of the national banking law. It is well to note here that no part of that law requires any citizen to become a president or officer of a national bank. No man is compelled by that law to discharge any of the duties prescribed, or to put himself in a place where he can be liable to any of the penalties denounced by that law. But, if he voluntarily assumes the position of a president of a national bank, if he voluntarily takes the control and management of the funds invested in the stock and deposited in the vaults of a national bank, the law requires of him the faithful, honest, and exact performance of the duties it imposes upon such an officer, and imposes proper penalties for its violation. This is, certainly, not unreasonable, in view of the great public interest in safe depositories and solvent banks.

To prevent losses through the carelessness, imprudence, or faithlessness of its officers, every national bank is put under the control of the government by this law, and its officers are required to keep correct books of account, open at all times to the inspection of the proper government officers. The comptroller of the currency is empowered to control and direct the officers and directors of each bank, and, whenever the bank is so conducted as to imperil the safety of those interested in it, and the security of its depositors, it is his duty to wind up the bank, and to preserve any property of value in its control for those justly entitled to it. To furnish the comptroller with the necessary information to enable him to discharge these important duties, the law provides that, at least five times during every year, and on dates to be fixed by him, every

national bank shall make to him accurate and truthful reports of the condition of the bank, which shall show, in detail, and under appropriate heads, its resources and liabilities, in such form as he shall prescribe. The law requires these reports to be verified by the oath of the president or cashier of the bank. Each report is required to be a report of the condition of the bank on a day that is past when the report is called for, and the object of this provision is to prevent the bank officers from changing the character of the resources or liabilities so as to make the showing better than the bank's condition warrants, after the call is made, as might be easily done if the day fixed for the condition of the bank to be shown was subsequent to the call. The law also provides that these reports shall be published in the same general form in which they are made to the comptroller, and from these published reports stockholders, creditors, and depositors learn the condition and probable prospects of the bank. Another section of the law provides that the comptroller shall, with the approval of the secretary of the treasury, and as often as shall be deemed necessary, appoint suitable persons to make examinations of the affairs of the national banks, and these examiners are empowered to make a thorough examination into the affairs of any bank, to examine the bank officials upon their oaths, and to report in detail to the comptroller of the currency the condition of the bank examined.

It is obvious, from this brief review of some of the provisions of this law, that its efficacy must depend very much, and often entirely, upon the truth and correctness of the books of the bank and the report to the comptroller. If they are false, the comptroller, the examiner, and the public are liable to be deceived, the stockholders and depositors are liable to be misled, and the law itself evaded and practically annulled. To prevent the possibility of false books and false reports, the congress, in addition to the requirement that the report shall be verified by the oath of the president or cashier, wisely enacted that "every president, director, cashier, teller, clerk or agent of any such banking association who * * * makes any false entries in any book, report, or statement to the association, with the intent in either case to injure or defraud the association or any other company, body politic or corporate, or any individual person, or to deceive any officer of the association, or any agent appointed to examine the affairs of any such association * * * shall be deemed guilty of a misdemeanor" (section 5209, Rev. St.), and punished accordingly. Now, if this provision can be disregarded and evaded with impunity, if false books can be kept, and false reports made to the comptroller, by the officers and agents of the national banks at will, the national banking law will be deprived of much of its utility, and the greater part of its safeguards will be removed. It is this provision that the defendant stands charged with violating. The government charges that this defendant made false entries in three reports to the comptroller, and that he made many false entries in the books of the bank. The evidence is uncontradicted that the three reports in which the false entries were contained were sworn to by Mr. Allis as president of the First National Bank of Little Rock;

that, during the entire year 1892, he was the president of that bank; and that that bank was duly organized under the national banking law of the United States, and was engaged in the business of banking at the city of Little Rock, in this state.

There remain but two questions for you to determine under any of the counts of this indictment that will be submitted to you. They are: First, did the defendant make any of the false entries charged? If you find that he did, then, second, did he make any of them knowingly, with the intent to injure or defraud the bank, or any other body politic or corporate, or individual person, or to deceive any officer of the association, or to deceive any person appointed or thereafter to be appointed by the comptroller to examine the bank?

The "false entry" that is punishable under this statute is an entry that was knowingly and intentionally false when made. It was not the purpose of congress to punish an officer who, through an honest mistake, makes an entry in one of the books or reports of the bank which he believed to be true, when it is, in fact, false. It follows that, in order to convict the defendant, you must find, not only that he made a false entry in one of the books or reports of the bank, but also that he knew that entry to be false when he made it. If, however, you should find that he made a false entry in a report of the condition of the bank to the comptroller of the currency, you are authorized to presume, from that false entry itself, in the absence of any explanation, or of any other testimony, that he knew such entry to be false. This law makes it the duty of the president or cashier of the bank to make a true report of the condition of his bank to the comptroller, and to verify it. It imposes upon the officer who verifies the report the duty of knowing the condition of his bank, and truthfully reporting it. He testifies to the comptroller that the report he makes to him is, in fact, true and correct, and this oath presupposes that he knows whether it is true or false when he takes it, and he cannot afterwards be heard to say that he did not know the facts, unless he was himself mistaken, or deceived, after an honest endeavor to discharge his duty. He cannot keep himself in ignorance, willfully shut his eyes to the truth, or refuse to examine into the true condition of his bank, and to learn whether his report is true or false when he makes it, and thus escape liability. Nor can he intrust his duty and his conscience to his clerk or his bookkeeper, and then escape liability, civil or criminal, on the plea of ignorance. In such a case, the law presumes that he knows what his duty and his oath require him to know. But if, on the other hand, he honestly and faithfully investigates the condition of his bank, and compares it with his report, either alone or with the assistance of his clerk or bookkeeper, and then verifies it in the belief that it is correct, when, through mistake of his own, or some deception practiced upon him by his clerk or bookkeeper, it is false, he is guilty of no offense under this statute, and should not be punished.

Nor is a false entry in a report of the condition of the bank, or a false entry made in the books of the bank, punishable under this statute, unless you also find that it was made by the defendant or by his directions, with the intent either (1) to injure or defraud the

bank, or some other corporation, or some firm or person; or (2) to deceive some officer of the bank; or (3) to deceive some agent appointe ' or that thereafter is to be appointed to examine the affairs of the bank. But it is sufficient that he made a false entry knowingly, with the intent to deceive an agent that was appointed or that was thereafter to be appointed to examine its affairs, though he did not intend to injure or defraud the bank or to deceive its officers. It is sufficient that he made the false entry knowingly, with the intent to injure or defraud the bank, though he did not intend to deceive the examiner, or all the officers of the bank. It is sufficient that he knowingly made the false entry with the intent to deceive an officer of the bank, though he did not intend to injure or defraud the bank or to deceive the examiner. Moreover, this intent may be inferred from the false entry itself. The law presumes that a man intends the legitimate consequences of his acts, and, if the natural and probable consequence of a false entry in a report or a book of the bank is to deceive the examiner, or to injure or defraud the bank, or to deceive any of its officers, you are authorized to presume, from the entry itself, that it was made with that intent. It is no defense to a wrongful act, knowingly and intentionally committed, that it was done with an innocent intent. Your practical experience and daily observation of the acts and intents of men will materially aid you in determining this question of intention. The intent with which an act is done is often more clearly and conclusively shown by the act itself than by any words or explanations of the actor. Thus, if you found a stranger leading your horse, saddled and bridled, from your barn, in the night, without your permission, and he should explain to you that he did not intend to steal him, but was simply leading him out for exercise, you would undoubtedly infer his intent from his act rather than from his words. If you found a stranger kindling a fire in the hay in your barn or stable, and he should explain that he did not intend to burn the barn or stable, but was simply burning a little hay to warm his hands, you would probably judge of his intent from his act rather than from his explanation. So, in many cases, the actions of men speak their intentions more clearly and truthfully than do their words. In the case before us you have the evidence of this defendant's acts, and his explanation of them. If you find that he made any of the false entries charged, knowingly, you must determine with what intent he did it from the acts themselves, from their natural and legitimate consequences, from his own explanations, and from all the other evidence before you.

There is a decided conflict between the testimony of the witnesses Denny, Yost, and Kupferle, and the testimony of the defendant, upon very material issues in this case. It is your duty to reconcile this conflicting testimony where that is possible; and, where it is not, you should consider the interest these witnesses have, if any, in the issues on trial, and their bearing and apparent candor on the stand, and decide, in view of all the evidence, who has told the truth. It is proper for you to bear in mind, in weighing this evidence, that the testimony of a disinterested witness is more likely to be correct

than is that of a witness who has much at stake in the trial, whenever the testimony of the two witnesses is of equal credibility in other respects.

A false entry made in the books or reports of the bank by a clerk, bookkeeper, or other subordinate employé or officer, by the command or direction of the president of the bank, is a false entry made by the president, and he is liable to punishment for it under this statute, if he gives the direction, knowing the entry to be false, and with the intent explained to you.

Certain notes, made by various parties, have been introduced in evidence, and much testimony relating to them adduced, tending to show that some of them were not entered upon the books of the bank. Mr. Allis has testified that the proceeds of all of these notes were applied to the benefit of the Little Rock Bank, while Mr. Yost has testified, and referred you to entries in the books which, he claims, show, that the proceeds of some of these notes were credited to the individual account of Mr. Allis on the books of the Little Rock Bank, so that that bank really received no benefit from them. These notes, and the testimony concerning them and their proceeds, may be considered by you in determining whether or not Mr. Allis has testified truthfully, and in deciding who was the active manager of the bank in 1892, but beyond that they are not material to the issues in this case, and should not be considered in determining them.

There are 25 counts in the indictment before us, each of which charges a separate offense. The government does not press the 7th, 11th, 20th, 21st, 22d, 23d, and 24th counts, and you need not consider them. The court will call your attention to the offenses charged in the remaining counts, and to a portion of the evidence concerning them, in the order of time. You are not bound to be governed by any statement of the evidence made by the court; but, if your recollection accords with that of the court, you may accept it, and, if it differs from it, you may be governed by your own memory.

By the 13th, 16th, 19th, and 25th counts of this indictment, it is charged, in effect, that the defendant, as president of the bank, knowingly made false entries in one of its books, with the intent explained, by which it was made to appear, on the books of the bank, that on February 3, 1892, the Fourth National Bank of New York became indebted to the Little Rock Bank in the sum of $5,000, the First National Bank of Chicago in the sum of $15,000, and the Continental National Bank of Memphis in the sum of $15,000, by reason of the transfer of these amounts to these three banks, respectively, by the Massachusetts Loan & Trust Company by order of the Little Rock Bank. There are entries on the books of the Little Rock Bank which mean that on February 3, 1892, the three banks named became indebted to the Little Rock Bank in the way charged. It also appears, on the books of that bank, that the Massachusetts Loan & Trust Company was indebted to it in the sum of $35,000, from some time in August, 1891, until February 3, 1892. The respective officers of the three banks which were charged with the amounts aggregating $35,000, testified that their banks never received these sums of money, and never became indebted to the Little

Rock Bank on account of them; and one of the officers of the Massachusetts Loan & Trust Company testified that his company never transferred any of these amounts to either of these three banks, and, in fact, that his company never owed the Little Rock Bank at all, and never had any account with it whatever. If you believe the testimony of these witnesses, and it is undisputed, all these entries were false, sham, and misleading, and there never were any such transactions as they indicate.

Mr. Allis testified that the $35,000 charged to the Massachusetts Loan & Trust Company resulted from a discount by that company of a note of the Electric Street-Railway Company and himself for $25,000, dated about June 6, 1891, payable to the order of that company, and signed on the back by the Thomson-Houston Company. He says the proceeds of this note, together with the proceeds of a $10,000 note of like character, Mr. Coffin promised to place to the credit of the Little Rock Bank in the Massachusetts Loan & Trust Company, but that he did not do so. He says that he did not learn that this money was not to the credit of the Little Rock Bank until some time in November or December, 1891, and that he then directed the clerks of the bank to correct the entry. He denies that he ever told Mr. Denny to make the three entries charged in this count of the indictment; and it is claimed, on his behalf, that the fact that they were made while it is admitted that he was out of the state, and about the time when an examiner was here to examine the affairs of the bank, tends to show that these entries were made without his direction. On the other hand, Mr. Littlefield, an officer of the trust company, testified that the note of $25,000 discounted by his company had no relation or connection with the First National Bank of Little Rock; that the $25,000 note was negotiated by the Thomson-Houston Company, and the proceeds placed to the credit of that company; and that the $10,000 note was placed in the hands of the trust company to be delivered to a bank in Reading, at which the Thomson-Houston Company negotiated it. Mr. Denny, the cashier of the Little Rock Bank, testifies that, in the latter part of January, 1892, the defendant directed him to make the false entries of February 3, 1892; that he made them pursuant to that direction; and that, on February 13, 1892, by direction of the directors of the Little Rock Bank, he credited these three banks with the amounts charged to them, respectively, and charged the aggregate amount to the defendant, and the latter never complained of it. It is for you to decide who has told the truth here.

By counts 14 and 15 of this indictment, the government charges, in effect, that on the 22d day of February, 1892, the defendant, as president of the bank, knowingly made false entries in certain books of the bank with the intent explained to you, by which it was made to appear on those books that, on February 22, 1892, the Little Rock Bank became indebted to the defendant in the sum of $50,000, and that the First National Bank of New York became indebted to the Little Rock Bank in the sum of $25,000, by reason of the deposit by Mr. Allis of $25,000 in the First National Bank of New York to the credit of the Little Rock Bank. It admittedly appears, from the

books of the Little Rock Bank, that on February 20, 1892, Mr. Allis: had drawn out of the bank $42,180.65 more than he had deposited in it, and that he then owed the bank that amount.    There is a telegram in evidence by which, if it was sent by him, and is correct, he directed the cashier of the Little Rock Bank to charge the First National Bank of New York $25,000, the Southern National Bank of New York $25,000, and to credit his account $50,000.    Mr. Denny testifies that, pursuant to this telegram, he charged these banks and credited the defendant with the $50,000.    The officers of the two national banks testify that Mr. Allis never deposited either of these sums of $25,000 with either of them, and that neither of them ever became indebted to the Little Rock Bank on account of any transaction portrayed by these entries.    No witness comes to say that they did, and, if you believe their testimony, these entries were false.. There were no such transactions as they represent.    The defendant testifies he was in New York on February 20, 1892.    In one place, he says that he may have sent the telegram to the bank on that day. In another place, he says that he did not send, and could not have sent, any telegram of the tenor of that in evidence, because he would not order a charge against a bank before the money was actually deposited.    You have the telegram in evidence;  and Mr. Denny testifies that it was received by him in cipher, that the translation in evidence is a correct translation of the cipher telegram directing these entries, that the original telegram had Mr. Allis' name attached to it, and that he made these entries in obedience to it.    You must weigh this testimony, and determine here who is correct.    You may properly consider the motives that would probably have influenced either Mr. Denny or Mr. Allis to make or direct the making of these entries,—whether it is more or less probable that the defendant, whose account was largely overdrawn, would direct the making of these entries, by which he received a false credit of $50,- 000, than that Mr. Denny would either forge or change a telegram, or make false entries in the books of the bank, by which he apparently gained nothing personally, while his bank gave the defendant this false credit.    If you conclude that the defendant did not sign the telegram, the true meaning of which is embraced in the translation of this telegram in evidence, and did not direct these entries to be made, you need not consider these two counts further, but should acquit the defendant of the offenses charged in them.    If, however, you conclude that this is a genuine translation of a telegram sent by Mr. Allis, and that the entries were made in obedience to it, what was their effect?    It was this: The defendant, Allis, received a false credit of just $50,000 from the Little Rock Bank, and gave it, in return, the poor privilege of charging two New York banks, on its books, with that amount, which these banks did not owe, and which the Little Rock Bank could never collect from them.    And, if he caused these entries to be made, with what intent did he do so?    If a customer, or friend of yours, who owed you $40,000 on account, should come to you, and tell you that he had deposited $50,000 to your credit in the German National Bank of Little Rock and that he wanted a receipt for the $40,000 that he owed you, and wanted a

credit for the other $10,000, and you should give him the receipt and the credit, and should subsequently learn that he had never deposited one dollar in that bank for you, with what intent would you conclude he had made these statements? Would you think it was with an honest purpose, or with some intent to injure or defraud you?

By counts 10, 17, and 18 the government charges, in effect, that on the 1st day of March, 1892, the defendant, as president of the Little Rock Bank, knowingly made false entries in certain books of that bank by which it appeared from those books (1) that the Little Rock Bank became indebted for a demand certificate of deposit in the sum of $50,000, and that the National Hide & Leather Bank of Boston, Mass., became indebted to the Little Rock Bank in a like amount; (2) that the Little Rock Bank paid its note of $15,000 to the American National Bank of Kansas City by transferring $15,000 from the National Hide & Leather Bank to the Kansas City Bank; and (3) that the Little Rock Bank paid its note of $28,000 to the National Bank of Commerce of St. Louis by transferring $28,000 of the amount of its credit with the National Hide & Leather Bank to the St. Louis Bank. By count 3 of the indictment, the government charges that, in a report of the condition of the Little Rock Bank at the close of business on March 1, 1892, verified by the defendant as president on March 7, 1892, he, with the intent explained to you, knowingly entered the false statement that that bank had no bills payable, when it then owed the two notes just mentioned, aggregating $43,000.

The report of the condition of the bank March 1, 1892, does state that the bank then had no bills payable. Mr. Dominick, of the American National Bank of Kansas City, testified that his bank then held a note of the Little Rock Bank on which there was $15,000 unpaid, and that this note was not paid until March 17, 1892. Mr. Vanvlarcom, of the National Bank of Commerce, testified that his bank then held the note of the Little Rock Bank for $28,000, which was not paid until March 15, 1892. If you believe this evidence, that report was false in its statement of the bills payable, and there is nothing for you to determine, upon this count, but the knowledge and intent of the defendant in making it; for he has admitted, in his own testimony, that he knew, on March 1st, that these notes were out, and that the holders of them were pressing for payment. The books of the bank do show entries to the effect charged in these counts (10, 17, and 18) under the date of March 1, 1892. The defendant himself admits that he signed the slip directing these entries to be made, and both he and Mr. Yost, the bookkeeper, testified that a certificate of deposit of the Little Rock Bank in favor of the National Hide & Leather Bank and two drafts of the Little Rock Bank on the National Hide & Leather Bank, one for $15,000 in favor of the Kansas City Bank, and one for $28,000 in favor of the St. Louis Bank, were drawn, either on the 1st or the 7th of March, and delivered to the defendant, and that these drafts were drawn to pay the two notes. It is admitted, or established by the testimony of the defendant himself, that these drafts were never used to pay the notes,

and that the National Hide & Leather Bank never received the certificate of deposit, and never became indebted to the Little Rock Bank on account of it. In other words, every one of these papers and entries was sham. They never represented any actual transaction that was completed. The certificate and the drafts were never in force, because they were never delivered to the parties in whose favor they were drawn, and the entries portrayed transactions that never in fact existed.

But Mr. Allis testified that he obtained an offer of a loan of $50,000 from the National Hide & Leather Bank on the certificate of deposit of the Little Rock Bank, and had brought this offer to the attention of his board of directors, who referred the matter to Mr. Kupferle. He says that Mr. Kupferle concluded to take the loan on the 1st of March, 1892, and that he on that day caused these entries to be made, and delivered the certificate of deposit and the drafts to Mr. Kupferle to be sent to the respective banks in whose favor they were drawn. He says that he supposed they were sent, and that the two notes were paid, until after he had verified his report to the comptroller on the 7th of March, 1892, and that he did not learn that they had not been until about March 14, 1892. On the other hand, Mr. Kupferle testifies that he never received the certificate or either of the drafts, and that he never heard of them until this trial. Mr. Yost, the bookkeeper, and Mr. Hays testified that these entries in the books were not made until March 7th or 8th, and that they were made under the date of March 1, 1892, by making interlineations and erasures in the books, and they produce the books showing these interlineations and erasures. Mr. Yost, who received from Mr. Allis the slips, signed by him, which directed these entries, and which, Mr. Allis says, were made on March 1, 1892, testifies that the defendant, on March 6, 1892, directed him to draw the drafts and the certificate, and to make these entries under the date of March 1st. It is for you to decide, in view of the testimony of Mr. Kupferle, Mr. Yost, and Mr. Hays, the interlineations and erasures in the books, and the probable interests of these various witnesses to testify falsely, whether the defendant directed these entries to be made on March 1st, when they bear date, or on March 6th. If you find that he gave the directions on March 1st, you must then consider whether he delivered the drafts and certificate to Mr. Kupferle on that day, and whether or not he believed they were sent forward to the banks, so that he was himself mistaken or deceived when he verified his report on the 7th of March. But, if you find that these entries were directed to be made on March 6th, you will consider their effect, and the intent with which the direction was made. The effect of these entries was: (1) They made the bills payable appear upon the books to be $43,000 less than they actually were. (2) They made the demand certificates of the Little Rock Bank to appear upon the books to be $50,000 more than they actually were, thus making the total liabilities of the bank appear upon the books to be $7,000 more than they actually were. (3) They made the entire resources of the bank appear upon the books to be $7,000 more than they actually were, by making the amount due from other

national banks that much in excess of the actual amount. These were radical changes, and they entered into the report of March 1st. What could have been the intent in making these changes on the 6th of March, if you find they were so made, if it was not to make the report to the comptroller show less bills payable than actually existed on the 1st of March? If the truth would have answered the purpose as well, why was the truth not told?

By the fourth count the government charges that, in the report of the condition of the bank on March 1, 1892, the defendant made a false entry of $69,659.29 as the amount due from other national banks, when the amount actually due from them was only $9,659.29. That this entry was made, and that it was false, is not disputed. Mr. Allis, you will remember, testifies that he did not know of the discrepancy; that he compared a pencil copy of the report furnished by Mr. Yost with the books, and found it correct; and that, when the written report was made, he compared that with the pencil report, and found that they agreed. On the other hand, the bookkeeper testified that this entry was made by the express direction of Mr. Allis, that he made up the figures from the books with him, and inserted them in the report by his direction. It is undisputed that, while the amount due from other national banks was reported at $60,000 more than it actually was, the amount due from approved reserve agents was reported at $60,000 less than it was, so that the aggregate amount of liabilities was not actually changed by this false entry. You must determine whether this entry was made by the direction of Mr. Allis. If it was, it is proper for you to consider the fact that it did not change the aggregate amount of the resources or liabilities of the bank, so far as this bears upon the defendant's intent. A change of this character is not as strong evidence of an intent to injure or defraud the bank, as entries in its books that would enable the defendant to draw money without consideration would be; but if such an entry as this is knowingly made with the intent explained to you, it is as much a violation of the law as a more radical change. The law requires the entries to be true. It does not permit the officers of the bank to make false entries, or reports that, in their opinion, are just as good as true ones. Two wrongs do not make a right. It is no defense, for one who takes your horse, that he took another horse from your neighbor, that was just as good, and turned him over to you; and it is no defense for a bank officer, who knowingly makes a false entry in a report, with criminal intent, that he made another false entry to offset it, with like intent.

By the fifth count in the indictment, the government charges, in effect, that the defendant, as president of the bank, made a false entry in his report of the condition of the bank at the close of business March 1, 1892, with the intent explained to you, by which the overdrafts were made to appear $20,033.09 less than they actually were. The bookkeeper testifies that, in pursuance of the directions given by the defendant at that meeting on Sunday, March 6th, he thereafter changed the books so as to make them show the overdrafts, at the close of business, March 1, 1892, $20,033.09 less than

the books did show at the close of business on that day, and that, at the same time, he changed the books so as to make the loans and discounts that much more, and that the report to the comptroller was made to correspond to the books so changed. An overdraft occurs when a depositor of a bank checks out more money than he has in the bank. Sometimes the bank permits this to be done without security, and without previous arrangement; and sometimes a previous arrangement to this effect is made, and security for the repayment of that amount is given, and a rate of interest is agreed upon. But every overdraft, whether by previous arrangement or not, and whether secured or not, and whether drawing interest or not, is a loan; and every such overdraft is required, by the law and the rules prescribed by the comptroller, to be listed and reported as an overdraft. It is, therefore, no defense to this charge that any of these overdrafts had been arranged for or secured, or that interest was to be paid upon them by agreements made before March 1, 1892, if you find that this entry was knowingly directed to be made by the defendant, with a criminal intent. Mr. Allis testified that $20,-033.09 of the overdrafts that existed on the 1st day of March were paid by the demand notes of customers taken by him on that day, so that, in fact, the overdrafts were that amount less than they appeared on the books at the close of business on that day. If you find his testimony to be true, this fact is a complete defense to this count in the indictment. If the overdrafts were in fact paid by the notes delivered to the bank, Mr. Allis had the right to direct the books to be changed so as to show the truth, and he had the right to make the report show it. In passing upon the validity of this defense, you will remember the interlineations and erasures in the books, and that Mr. Yost and Mr. Smith testified that the notes did not come to them to be entered upon the books of the bank until the 7th or 8th of March. The only real question under this count is whether these notes were signed and delivered to Mr. Allis on the 1st of March, or not until some later date.

By the eighth and ninth counts in the indictment, the government charges that the defendant, as president of the bank, with the intent explained to you, knowingly made such false entries, in the report of the condition of the bank at the close of business on July 12, 1892, that the report showed the overdrafts to be about $21,000 less than they actually were, and the loans and discounts about $21,000 more than they actually were. The report does show the overdrafts to be $16,766.98 less than they appear to have been by the bank books on July 12, 1892, and it shows the loans and discounts $16,766.98 more than the books showed them to be. This report was sworn to by Mr. Allis July 18, 1892. The bookkeeper, Yost, testifies that he made and delivered to Mr. Allis a pencil report, showing the condition of the bank at the close of business July 12, 1892, as the books showed it; that Mr. Allis returned it, and directed the report to be made out with the false entries of overdrafts and loans and discounts shown by the report. The defendant says that he did not change the pencil report, that he does not recollect that the verified report did not correspond with the books, and that this $16,766.98

was the amount of overdrafts, that were considered as loans and discounts, and were secured by deeds of trust. You will remember, here, what the court has already charged you to the effect that every overdraft is a loan, and that, under the law and the directions of the comptroller, it was the duty of the defendant to include all the overdrafts of the bank, secured or unsecured, in his statement of overdrafts. But you may consider his testimony, that he considered them as loans, in determining his intent in making this entry, if you find he directed it to be made.

The bookkeeper, Yost, testified that, on July 12, 1892, the books showed the individual account of Mr. Allis to be overdrawn $15,-684.63; that Mr. Allis, on the 18th day of July, as he believes, directed him to make the books show, under the date of July 12, 1892, that the United States National Bank of New York then became indebted to the Little Rock Bank in the sum of $49,641.68, and that the Little Rock Bank then became indebted to or received a deposit from the defendant of $49,641.68. He says he made the necessary interlineations and erasures to accomplish this, and then prepared the report on the basis of the changed books, and the further change of the $16,766.98 which has been spoken of. The entries, interlineations, and erasures of which he speaks do appear in the books. The bank books also show that, on July 18th, the United States National Bank was credited $25,000, on July 19th, $25,000, and on August 6th it was charged $358.32, thus wiping out this charge of $49,641.68. The president of that bank testifies that no such transactions as these entries represent were ever had between his bank and the Little Rock Bank; that his bank never owed that bank $49,641.68 on account of the deposit by Allis at this time. If you believe this evidence, these entries regarding this item were all sham, false, and misleading. If you believe this testimony, there were no such transactions as these entries represent, and there is no truth in them. Their effect was this: (1) They wiped out the defendant's overdrafts of $15,684.63, and made the books show the overdrafts to be less by that amount than they actually were; and, as the report represented them $16,766.98 less than these doctored books showed them, the report, if you believe this evidence, stated these overdrafts at least $32,000 less than they actually were. (2) The false credit thus given the defendant for $49,641.68 not only wiped out his overdrafts, but placed the surplus, $33,957.05, to the credit of his individual account, and thus made the individual deposits with the bank appear in the books, and in the report based on the books, $33,957.05 more than they actually were. (3) They gave Mr. Allis this false credit of $49,641.68, and enabled him to take that credit from the Little Rock Bank on this entry, upon no consideration but this sham charge against a New York bank, that owed nothing on account of it. Mr. Allis admits that he signed the slips which authorized these entries, but testifies that they were made on July 12, 1892, and not at the later date at which the bookkeeper says he made them. He also testifies that these entries represented actual transactions at the time. What these transactions were he does not explain, nor does he explain why it was that the $49,641.68 which was thus charged to

the United States National Bank on July 12, 1893, was all credited back to it within 30 days, or why it was that that bank never had any account of the transaction he says these charges represent. If you find that these entries represented actual transactions, as the defendant has testified, you should acquit him on these two counts; but, if you find that these entries were sham or false entries, you should consider the facts that through them Mr. Allis obtained this false credit of $49,641.68, that the individual deposits of the bank subject to check were thereby made to appear $33,957.05 more than they actually were, and the overdrafts at least $32,000 less than they actually were, in determining whether the defendant caused these entries to be made with the intent to injure or defraud the bank, or deceive any of the officers or the examiner. If you find that these entries were knowingly false, and were directed by him, and that the entries of the 22d of February were false, and were directed by him, you may well consider with what intent these two sets of entries, by which a false credit was given to the defendant in the Little Rock Bank of $99,641.68, for no consideration but the false charges against Eastern banks that owed the Little Rock Bank nothing on account of them, came to be made.

By the first and second counts of the indictment the government charges that the defendant, as president of the bank, made certain false entries in the report of the condition of the bank at the close of business December 9, 1892, which was verified by him December 16, 1892, by which the individual deposits subject to check were stated to be $100,000 more than they actually were, and the notes and bills rediscounted were stated to be $100,000 less than they actually were. It is undisputed that these false entries were made in the report. The bookkeeper, Yost, testifies that he made a report in pencil, showing these items as they actually were upon the books, and gave it to Mr. Allis; that he handed it back to him with these two $100,000 changes made; and that he then made the written report according to this changed report, and the defendant verified it. On the other hand, the defendant testifies that he did not know the report was not right, and that he did not make or direct the changes in the pencil memorandum; that he compared the pencil memorandum with the books, and found it correct, and, after the written report was completed, he compared that with the pencil report, and found these two to be alike. The differences between this report and the books are radical. They were in the two most important items in the report, in the two items most frequently examined and most carefully scrutinized by bankers, examiners, stockholders, depositors, and creditors,—the item of individual deposits subject to check, and notes and bills rediscounted. The change increased the individual deposits subject to check 42 per cent., and decreased the amount of bills and notes rediscounted 45 per cent. It is for you to say whether the defendant knew of or directed this change, or whether so radical a change in these important items was made through his mistake or through a deception practiced upon him.

The court has reviewed the counts of this indictment, and called your attention to some of the important evidence in this case, in

the hope that this might be of some assistance to you in reaching a just verdict. There is much testimony bearing upon many of these counts that has not been called to your attention. You will consider that as carefully and as well as that which has been referred to, and will remember that, whatever may have been said by the court, you are the exclusive judges of the questions of fact and of the credibility of the witnesses. The charges you are trying are the making of false entries. The defendant has testified that, when the Little Rock Bank was in financial distress, he exhausted his own property and his credit to save it from disaster. He says that he made every possible effort to induce his friends to loan him money to save this bank from suspension. He testifies that his individual account was used by himself and the other officers of the bank to carry unpaid subscriptions for it that had been forced upon him. If you find that Mr. Allis knowingly made any of the false entries charged with the intent explained to you, it is no defense for him that he struggled to save the bank, or to provide the money to pay its depositors by borrowing the money from others. It is no defense against one crime that the defendant did not commit another. But if you find that the false entries were made by his direction, you may and ought to consider this testimony of the defendant carefully in deciding whether or not he caused those entries to be made with the intent to injure or defraud the bank, or any corporation, firm, or person, or with the intent to deceive any of its officers or any examiner appointed or thereafter to be appointed by the comptroller.

On the other hand, the defendant is not on trial here for embezzlement, or abstraction or misapplication of funds, or for wrecking the bank. The evidence of credits and of moneys he obtained from this bank is before you for the purpose of aiding you to determine who caused the entries in question to be made in the books and reports, and if you should find that the defendant made them or caused them to be made, and that they were false, then to assist you in deciding whether or not the defendant, who by the entries of February 22 and July 12, 1892, if you find they were false, obtained this false credit of $99,641.68, on false charges against Eastern banks, that owed the Little Rock Bank nothing on account of them,—whose account, if you believe the uncontradicted testimony of Mr. Hays, was overdrawn, in amounts varying from a few dollars to over $40,-000 184 days out of 222 days between February 2 and December 10, 1892,—and who testifies that he owed the bank about $40,000 when it failed, made any of these entries knowingly, with any intent to injure or defraud the bank, or any other company, body politic or corporate, or any individual person, or to deceive any officer of the bank, or any examiner appointed or thereafter to be appointed to examine its affairs. For this purpose, and for no other purpose, should you consider this evidence.

It is not necessary, in order to convict the defendant, that you should find him guilty of all the 17 offenses charged in the counts of this indictment submitted to you. If you have no reasonable doubt that he knowingly caused any one of the false entries charged in any of these counts to be made, with the intent explained to you,

it is your duty to find him guilty. On the other hand, if there is no one of the offenses charged in any of these counts that you do not find him to be guilty of beyond a reasonable doubt, it is your duty to acquit him.

The jury retired, and, after they had deliberated for 24 hours, the court recalled them, and inquired if they had reached a verdict, to which the jury, through their foreman, responded that they had not. The court then asked if there was any portion of the charge of the court that it would be of assistance to them to have re-read, to which the foreman of the jury replied that there was a portion of the charge that was not fully understood by all the jury,—that portion in reference to the weight of the testimony of the witnesses. The court thereupon re-read that part of the charge which related to the conflict and weight of testimony of the witnesses.

After re-reading that part of the charge, the court further charged the jury as follows:

This is an important case. The trial has been long and expensive. Your failure to agree upon a verdict will necessitate another trial equally as expensive. The court is of the opinion that the case cannot be again tried better or more exhaustively than it has been on either side. It is therefore very desirable that you should agree upon a verdict. The court does not desire that any juror should surrender his conscientious convictions. On the other hand, each juror should perform his duty conscientiously and honestly, according to the law and the evidence. And, although the verdict to which a juror agrees must of course be his own verdict, the result of his own convictions, and not a mere acquiescence in the conclusions of his fellows, yet, in order to bring 12 minds to a unanimous result, you must examine the questions submitted to you with candor, and with a proper regard and deference to the opinions of each other. You should consider that the case must at some time be decided, that you are selected in the same manner and from the same source from which any future jury must be, and there is no reason to suppose that the case will ever be submitted to 12 men more intelligent, more impartial, or more competent to decide it, or that more or clearer evidence will be produced on one side or the other. In the present case the burden of proof is on the United States to establish its case beyond a reasonable doubt, and if, upon any count of the indictment submitted to you, you have a reasonable doubt, based upon the evidence, of the guilt of the defendant, you ought to acquit him on that count. But, in conferring together, you ought to pay proper respect to each other's opinions, with a disposition to be convinced by each other's arguments. And, on the one hand, if much the larger number of your panel are for a conviction, a dissenting juror should consider whether a doubt in his own mind is a reasonable one which makes no impression upon the minds of so many men, equally honest, equally intelligent with himself, who have heard the same evidence, with the same attention, with an equal desire to arrive at the truth, and under the sanction of the same oath. And, on the other hand, if a majority are for acquittal, the minority ought

seriously to ask themselves whether they may not reasonably, and ought not to, doubt the correctness of a judgment which is not concurred in by most of those with whom they are associated, and distrust the weight or sufficiency of that evidence which fails to carry conviction to the minds of their fellows. In order to acquit the defendant of the 17 charges submitted to you, you must consider all of them, and find that he is not guilty of any of them. On the other hand, if you find that he is guilty of any one of them, you should return a verdict of guilty. You may conduct your deliberations as you choose, but I suggest that you now retire and carefully consider again the evidence relating to a few counts,—for instance the fourteenth and fifteenth, or the eighth and ninth,—and to call your attention to them more clearly I will again read to you that portion of the charge relating to the claims of the parties concerning these four counts.

After re-reading the portion of the charge relating to the eighth and ninth and fourteenth and fifteenth counts of the indictment, the court made the following closing remarks to the jury:

Of course, gentlemen of the jury, you must consider all the other parts of the charge heretofore read to you also. I have simply called your attention to these four counts, thinking, possibly, that I might assist you in arriving at a just conclusion. The court and jury are here to come to a just and righteous result. No doubt you are as anxious to reach it as am I. So anxious is the court that, having spent now two weeks in the trial of this cause, I am willing to stay here another, if by that means we may be able to reach a just and proper result in this trial. You may retire.

The jury returned a verdict of guilty on the fourteenth count of the indictment, upon which verdict the defendant was sentenced to imprisonment for the term of five years. A writ of error was sued out to the supreme court, where the judgment was affirmed. See Allis v. U. S., 155 U. S. 117, 15 Sup. Ct. 36.