## HALLOCK v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. February 10, 1911.)

### No. 3,139.

**1.** CONSTITUTIONAL LAW (§ 199*)—VENUE—TRANSFER OF JURISDICTION ON ADMISSION OF STATE.

The fact that the organic act of the territory of Oklahoma required criminal offenses to be tried in the county where committed does not render the provision of the enabling act of the state transferring jurisdiction of offenses against the United States to the District Court for the appropriate district invalid as an ex post facto law with respect to offenses previously committed, and such District Court has jurisdiction to indict and try a person for such an offense, although not held in the county where it was committed.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 571–583; Dec. Dig. § 199.*]

**2.** PERJURY (§ 7*)—PROOF ON COMMUTATION OF HOMESTEAD ENTRY—COMPETENCY OF ENTRYMAN AS WITNESS.

Rev. St. § 2301, as amended by Act March 3, 1891, c. 561, § 6, 26 Stat. 1098 (U. S. Comp. St. 1901, p. 1406), provides for the commutation of homestead entries after 14 months "upon making proof of settlement and of residence and cultivation for such period of 14 months" without specifying the kind of proof. Before amendment, the section required proof to be made as in pre-emption cases, which, under a regulation of the department, was by the testimony of the claimant corroborated by at least two witnesses. *Held*, that after the amendment, in the absence of a regulation providing otherwise, the same manner of taking proof might properly be followed, in which case the entryman was a competent witness as to his own settlement, and his false testimony respecting the same constituted perjury.

[Ed. Note.—For other cases, see Perjury, Cent. Dig. § 23; Dec. Dig. § 7.*]

**3.** CONSTITUTIONAL LAW (§ 199*)—EX POST FACTO LAWS—STATUTE FIXING NUMBER OF GRAND JURORS.

The fifth constitutional amendment, which requires a presentment or indictment by a grand jury before a person can be tried for an infamous crime, does not give an accused the constitutional right to an indictment by a grand jury composed of the particular number of members prescribed by statute at the time the offense was committed before he can be placed on trial, and the statute governing procedure in the federal courts in the states and fixing the number of members which shall compose a grand jury at not less than 16 nor more than 23, and requiring the concurrence of 12 in an indictment, is not invalid as an ex post facto law as applied to an offense committed in the territory of Oklahoma for which an indictment was found after the admission of the state by a grand jury of 19, although under the territorial law the number was fixed at not less than 12 nor more than 16, and 12 were required to concur to return an indictment.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 571–583; Dec. Dig. § 199.*]

**4.** PERJURY (§ 13*)—SUBORNATION OF PERJURY—NATURE OF OFFENSE UNDER FEDERAL LAW.

The crime of subornation of perjury at common law and under the laws of the United States is a misdemeanor.

[Ed. Note.—For other cases, see Perjury, Cent.Dig. § 61½; Dec.Dig. § 13.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

185 F.—27

5. CONSTITUTIONAL LAW (§ 199*)—EX POST FACTO LAW—STATUTE RELATING TO CRIMINAL PROCEDURE.

Rev. St. § 819 (U. S. Comp. St. 1901, p. 629), which limits the number of peremptory challenges of a defendant charged with a misdemeanor in a federal court to three, is not invalid as an ex post facto law as applied to a defendant charged with an offense committed in Oklahoma territory, but indicted and tried after the admission of the state because under the law of the territory he was entitled to a larger number.

[Ed. Note.—For other cases, see Constitutional Law, Cent. Dig. §§ 571–583; Dec. Dig. § 199.*]

6. CRIMINAL LAW (§ 342*)—EVIDENCE—KNOWLEDGE AND INTENT.

A wide latitude in the evidence is permitted in a criminal case to show corrupt motive and intent especially where they constitute an important element of the offense as in a prosecution for subornation of perjury.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 773, 774; Dec. Dig. § 342.*]

7. PERJURY (§ 37*)—TRIAL FOR SUBORNATION OF PERJURY—INSTRUCTIONS.

Instructions considered and approved in a prosecution for subornation of perjury, defining the elements of the offense.

[Ed. Note.—For other cases, see Perjury, Cent. Dig. §§ 134–138; Dec. Dig. § 37.*]

Sanborn, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Western District of Oklahoma.

D. H. Hallock was convicted of a criminal offense, and brings error. Affirmed.

R. R. Vermilion and A. G. C. Bierer (W. E. Stanley, Frank Dale, Earle W. Evans, and Benj. F Hegler, on the brief), for the plaintiff in error.

John Embry, U. S. Atty.

Before SANBORN, HOOK, and ADAMS, Circuit Judges.

HOOK, Circuit Judge. D. H. Hallock was convicted of suborning two young women residing in Kansas to commit perjury in making their final proofs in the commutation of their homestead entries on public lands in Oklahoma as charged in the fourth and fifth counts in the indictment. Seventy-nine assignments of error are relied on, but only those will be discussed which appear to merit it. They relate to five subjects: (1) The jurisdiction of the trial court; (2) the sufficiency of the indictment and the grand jury which found it; (3) the limiting of peremptory challenges of petit jurors; (4) the evidence; (5) the instructions.

The offenses were committed in Woodward county, territory of Oklahoma. The indictment was not found nor the trial had until after that territory and the Indian Territory were admitted as the state of Oklahoma. The organic act of the territory of Oklahoma in force when the offenses were committed required their prosecution and trial in Woodward county. The District Court of the United States in which the accused was indicted and tried did not sit in Woodward county. Upon this it is contended that the accused could not lawfully be tried outside that county; that the enabling act (Act June

16, 1906, c. 3335, § 14, 34 Stat. 275 [U. S. Comp. St. Supp. 1909, p. 155] Act March 4, 1907, c. 2911, 34 Stat. 1286) providing otherwise is ex post facto; and, also, that the act last mentioned gave the court jurisdiction only of such cases for prior offenses as were pending at the change to statehood. These contentions are answered by Billingsley v. United States, 101 C. C. A. 465, 178 Fed. 653; Pickett v. United States, 216 U. S. 456, 30 Sup. Ct. 265, 54 L. Ed. 566; Gut v. State, 9 Wall. 35, 19 L. Ed. 573.

As to the sufficiency of the indictment: The perjury of which the accused was charged with suborning was that of the two entrywomen regarding their settlement, residence, and cultivation of the lands. It is claimed that section 2291, Rev. Stat. (U. S. Comp. St. 1901, p. 1390), relating to homestead entries, governs the kind and character of proof on the commutation of such entries, and, as it merely calls for an affidavit of nonalienation by the entryman and proof of residence and cultivation by "two credible witnesses," the personal testimony of the entrywomen upon the subjects mentioned was not required by law, was purely voluntary, and not the subject of perjury. We do not think the section relating to homestead entries is applicable. Section 2301, Rev. Stat. (page 1406), provided that the proof of settlement and cultivation in commutation cases should be as in preemptions, and as to pre-emptions section 2263 provided that proof of settlement and improvement should "be made to the satisfaction of the register and receiver of the land district in which such lands lie, agreeably to such rules as may be prescribed by the Secretary of the Interior." A regulation of the department under that law prescribed that the final proof of pre-emptors upon those matters should consist of the testimony of the claimant corroborated by that of at least two witnesses. Were this all, it would be plain that the two homestead entrywomen desiring to commute their homestead entries to cash entries were proper witnesses to testify upon the subjects in question. But in 1891 the above-mentioned section 2301 relating to commutations was amended. Act March 3, 1891, c. 561, § 6, 26 Stat. 1098 (U. S. Comp. St. 1901, p. 1406). Formerly the right to commute could be exercised any time before the expiration of five years from the date of the homestead entry. The amendment provided that it could be exercised any time after 14 calendar months from the date of entry and "upon making proof of settlement and of residence and cultivation for such period of fourteen months." It will be observed that specific reference to the pre-emption law for the kind of proof was omitted from the amendatory act of 1891. Because of this counsel for the accused contend that the homestead law (section 2291, Rev. Stat.) applies, but we think the reason for the omission was probably because the pre-emption law was repealed by the same act that amended the commutation law. Act March 3, 1891, c. 561, §§ 4, 6, 26 Stat. 1097, 1098 (U. S. Comp. St. 1901, pp. 1381, 1406). We can find no indication of a purpose to adopt the particular method of making proof required in homestead cases. The law says an entry may be commuted "upon making proof of settlement and of residence and cultivation." No provision appearing in the law the matter of witnesses to make the proof would properly be the subject of a de-

pàrtmental regulation, and, in the absence of one, the officials of the Land Office would be fully justified in following the practice that formerly obtained. An entryman would appear to be a competent witness of his own settlement, residence, and cultivation, and his false testimony respecting the same the subject of perjury.

A statute of Oklahoma Territory in force when the offenses were committed required a grand jury to·be composed of not less than 12 nor more than 16 members and the concurrence of at least 12 in the finding of an indictment. The act of Congress applying to the federal procedure in the states fixes the number at not less than 16 nor more than 23, and requires a like concurrence for an indictment. The grand jury which indicted the accused was drawn and impaneled under the act of Congress after the admission of Oklahoma as a state, and was of 19 members. It is claimed the act of Congress as to offenses committed before statehood is ex post facto, and the constitutional rights of the accused were therefore violated. Various tests have been given for determining whether a statute is ex post facto as applied to. an act committed prior to its passage. Does it make criminal that which was innocent, or aggravate the crime, or change and make the punishment greater, or alter the legal rules of evidence and lessen the amount or measure necessary to convict? Mallett v. North Carolina, 181 U. S. 589, 21 Sup. Ct. 730, 45 L. Ed. 1015. Does it "take from an accused any right that was regarded, at the time of the adoption of the Constitution, as vital for the protection of life and liberty, and which he enjoyed at the time of the commission of the offense charged against him"? Thompson v. Utah, 170 U. S. 343, 18 Sup. Ct. 620, 42 L. Ed. 1061. In its relation to the offense or its consequences does it alter the situation of a party to his disadvantage? United States v. Hall, 2 Wash. (C. C.) 366, Fed. Cas. No. 15,285; Kring v. Missouri, 107 U. S. 221, 228, 2 Sup. Ct. 443, 27 L. Ed. 506. But as was held in Gibson v. Mississippi, 162 U. S. 565, 590, 16 Sup. Ct. 904, 40 L. Ed. 1075, the inhibition upon the passage of ex post facto laws does not give a criminal a right to be tried in all respects by the law in force when the crime charged was committed. The mode of trial is always under legislative control, subject only to the condition that the Legislature may not, under the guise of establishing modes of procedure and prescribing remedies, violate the accepted principles that protect an accused person aginst ex post facto enactments. For example, the constitutional prohibition against ex post facto laws has been held not to apply to state laws which authorize an appeal by the state to the Supreme Court of the state from a decision of an inferior appellate court in favor of a defendant (Mallett v. North Carolina, 181 U. S. 589, 21 Sup. Ct. 730, 45 L. Ed. 1015); which make competent evidence of a disputed writing not competent before (Thompson v. Missouri, 171 U. S. 380, 18 Sup. Ct. 922, 43 L. Ed. 204); which enlarge the class of persons competent to testify in criminal cases (Hopt v. Utah, 110 U. S. 574, 4 Sup. Ct. 202, 28 L. Ed. 262); prescribing additional qualifications for jury service (Gibson v. Mississippi, 162 U. S. 565, 16 Sup. Ct. 904, 40 L. Ed. 1075); making a change in the organization of the Supreme Court of a state so that instead of a hearing before a full court of five justices the hearing is before a division

of the court composed of three out of seven justices (Duncan v. Missouri, 152 U. S. 377, 14 Sup. Ct. 570, 38 L. Ed. 485); changing the place of trial from one county to another in the same district or to another district (Gut v. State, 9 Wall. 35, 19 L. Ed. 573); changing the manner of summoning and making up the jury (Perry v. Commonwealth, 3 Grat. [Va.] 632); giving the government a right of peremptory challenge of jurors it did not have when the crime was committed (Walston v. Commonwealth, 16 B. Mon. [Ky.] 15; State v. Ryan, 13 Minn. 370 [Gil. 343]); reducing the number of peremptory challenges allowed defendants in trials of felonies, not capital (South v. State, 86 Ala. 617, 6 South. 52); reducing the number of grand jurors (State v. Ah Jim, 9 Mont. 167, 23 Pac. 76); preventing a defendant from taking advantage of variances in an indictment which are not prejudicial to him (Commonwealth v. Hall, 97 Mass. 570); authorizing an appellate court on writ of error to render such judgment as should have been rendered (Jacquins v. Commonwealth, 9 Cush. [Mass.] 279); making the court the judge of the law, whereas before the jury were (Marion v. State, 20 Neb. 233, 29 N. W. 911, 57 Am. Rep. 825); depriving a defendant of a right of change of venue from an examining magistrate (People v. McDonald, 5 Wyo. 526, 42 Pac. 15, 29 L. R. A. 834); changing practice from indictment to information (Lybarger v. State, 2 Wash. St. 552, 27 Pac. 449, 1029; State v. Lloyt, 4 Wash. 818, 30 Pac. 1060); the substitution of information for indictment under the authority of the state Constitution (In re Wright, 3 Wyo. 478, 27 Pac. 565, 13 L. R. A. 748, 31 Am. St. Rep. 94; People v. Campbell, 59 Cal. 243, 43 Am. Rep. 257). In the last case the court said:

"It is not uncommon practice to change the number of grand jurors required to investigate criminal charges, but we have never heard of the right of the Legislature to make such changes questioned, neither has it ever been claimed that the charge must be investigated by the precise number of grand jurors of which that body was composed, at the time the act was committed."

While the tendency of courts, both national and state, is generally to hold rules of procedure as subject to change and not of substantive, vested right, some state courts lean the other way. An instance is the Criminal Court of Appeals of Oklahoma, which in Sharp v. State, 3 Okl. Cr. 24, 104 Pac. 71, expressed views at variance in some respects with those we entertain. But cited here that case is not within the general rule that the construction by the highest court of a state of its Constitution and laws is binding upon the federal courts. The question before us is whether under the Constitution of the United States certain acts of Congress prescribing procedure may be applied to a trial for crime against the United States, though not applicable when the crime was committed. True, it was statehood which brought the particular acts of Congress into play, and the Constitution of Oklahoma was one of the steps towards statehood; but in the sense of the rule referred to the construction and application of the Constitution and laws of the state is not involved in the case before us.

In support of their contention counsel for the accused rely on Kring v. Missouri, 107 U. S. 221, 2 Sup. Ct. 443, 27 L. Ed. 506; Thompson v. Utah, 170 U. S. 343, 18 Sup. Ct. 620, 42 L. Ed. 1061; United States

v. Haskell (D. C.) 169 Fed. 449; United States v. London (D. C.) 176 Fed. 976; State v. Rock, 20 Utah, 38, 57 Pac. 532. The last three cases are like the case at bar, except that in the Rock Case there was a change of procedure from indictment to information. In the Haskell and London Cases the acts were done in the Indian Territory, and the indictments were found after the territory was admitted as part of the state of Oklahoma. The Haskell Case is rested largely on the Kring and Thompson Cases, and the London Case seems to have followed that of Haskell as the law of the district. We do not think either Kring v. Missouri or Thompson v. Utah decisive of the case at bar. We think the former is not at all applicable and the latter is distinguishable. This is the Kring Case: Under the law of Missouri in force when a homicide was committed, a conviction of murder in the second degree was an acquittal of murder in the first degree. The law was changed so that a sentence for the lesser crime lawfully vacated should not operate as an acquittal of the greater. After the new law became effective Kring pleaded guilty of murder in the second degree and was sentenced, but the sentence was set aside on his appeal. He was then tried and convicted of murder in the first degree. It was held the new law was ex post facto as to him. It may be noted that four of the justices dissented because the plea and sentence were after the change in the law. It was agreed that a sentence on a plea was equivalent to one on a verdict, and, what was done being equivalent under the local law to an acquittal of murder in the first degree, it was not competent for the state to deprive the accused of the benefit of it. Clearly that case has no bearing here.

In Thompson v. Utah it was held that a person charged with the commission of a felony whilst Utah was a territory was under the third article of the Constitution and the sixth amendment entitled to a trial by a jury as at common law; that at the common law a jury was composed of twelve persons and unanimity was essential to a verdict; and that a provision of the Constitution of Utah when it attained statehood reducing the number of jurors to eight was ex post facto as to the accused. The right to trial by jury has always been regarded as one of the fundamental guaranties of the Constitution, and it was held that what the United States could not do in that respect while possessing full jurisdiction over the territory the mere admission to statehood did not empower the state to do. The principle deducible from this case is that a matter of procedure ordinarily subject to legislative change may by provision of the Constitution take on the quality of a substantial right or safeguard secure from impairment. We think there is a clear distinction between that case and the one at bar. There, Thompson had a constitutional right of trial by a jury of twelve, no more, no less, of which he could not be deprived either by Congress or by the new state. What was ordinarily a matter of procedure thereby assumed the dignity of a fundamental safeguard not to be destroyed by a subsequent law. In the case at bar the accused was by the fifth amendment exempt from accusation except by presentment or indictment of a grand jury, but the amendment went no further in terms, and if the accused had any constitutional right as to the number of grand jurors, which we need not de-

termine, it was that there should be not less than 12 nor more than 23 as at common law. That right was accorded him in a grand jury of 19. True, a maximum of 16 was prescribed by the statute of Oklahoma Territory, but there was no constitutional quality in that particular number. It was purely statutory. As was said in Matter of Moran, 203 U. S. 97, 27 Sup. Ct. 26 (51 L. Ed. 105):

"The fifth amendment, requiring the presentment or indictment of a grand jury, does not take up unto itself the local law as to how the grand jury should be made up and raise the latter to a constitutional requirement."

The details of qualification and impaneling and the precise number between 12 and 23 are matters with which the amendment is not concerned. They belong to procedure, and are left to legislative discretion. They are not inherently of substantive right within the tests of ex post facto laws above enumerated. Indeed, as already noted, it has been held that, in the absence of a constitutional requirement of indictment, a Legislature may do away with it, and substitute information for offenses previously committed. How less intrinsically important is the mere number of grand jurors! An indictment is not a trial for crime. It is merely a form of public accusation upon which a trial may afterwards be had. Historical research into the origin of the procedure shows that the important thing was not the particular number of persons who participated in the investigation or who made the charge of their own knowledge as in a presentment, but that it should be under official or public sanction so that one might not be put to the ordeal upon mere private accusal.

It is urged that prejudice resulted from an increase of the maximum number of grand jurors, 16, under the statute of the territory, to 19, because out of the greater number it was easier to secure the concurrence of 12 to an indictment. We think the prejudice more imaginary than real. At the common law there was a range from 12 to 23, and, if the practice under that law was in contemplation at the adoption of the fifth amendment, it is apparent that the greater or less number between the limits was regarded as of such minor importance that it was left to the discretion of the courts. Even under the act of Congress, any circuit or district court impaneling a grand jury may determine whether there shall be 16 or 23 members or any number between, and it is common for a grand jury in one of those courts to vary in the number of attendant jurors during a single term of court. Safeguards of life and liberty regarded as substantial and important are not usually left in such an indeterminate condition. If a court may vary in everyday practice between the maximum and minimum limits no reason appears why the legislative branch of the government may not constitutionally exercise a similar discretion without impairing any substantial right of a defendant. This conclusion makes it unnecessary to determine whether the question can be raised for the first time in an appellate court.

The trial court, following the federal practice, limited the accused to three peremptory challenges of petit jurors. He claimed more. Section 819, Rev. Stats. (U. S. Comp. St. 1901, p. 629), gives a defendant charged with treason or a capital offense 20 peremptory challenges, in cases of felony 10, in all other cases 3. Was the of-

fense of the accused a felony or a misdemeanor? If it was a misdemeanor at common law, it retains its degree under the laws of the United States, unless, which is not the case, Congress has declared otherwise either directly or by adopting a state law defining its character. Considine v. United States, 50 C. C. A. 272, 112 Fed. 342; Morris v. United States, 88 C. C. A. 532, 161 Fed. 672. "Perjury at common law is a misdemeanor." 2 Whart. Crim. Law, § 1244. If the principal offense was technically false swearing at common law as distinguished from perjury, it was still a misdemeanor. United States v. Bailey, 9 Pet. 238, 256, 9 L. Ed. 113; O'Mealy v. Newell, 8 East, 364. The procurement of another to commit the principal offense would also be a misdemeanor. But, since a statute of Oklahoma Territory gave five challenges, it is argued that the law of the United States is ex post facto as applied to the accused. What we have said regarding the composition of the grand jury disposes of this contention. He was entitled to a trial by an impartial jury of 12 persons, and there is nothing to show it was not given.

As to the evidence: The absence of references in the briefs to pages of the record preclude the examination of many of the objections argued. In some instances there are no references whatever to the record, in others they are merely to the places where the assignments of error may be found, and in still others only to pages where certain exhibits appear but no recitals showing they were received in evidence, the grounds of objection, the rulings of the court, or exceptions. These conditions apply to most of the discussion of the evidence. The record contains 700 printed pages, and to require a search of it to discover the basis of assignments of error would impose a burden on the court it cannot assume. It is the general rule in the courts of the United States that the parts of the record to be examined must be definitely pointed out, and we have frequently directed attention to it and enforced it. Some of the complaints in the briefs are disposed of by what we have already said on the sufficiency of the indictment. Others relate to evidence admitted in support of counts in the indictment as to which there was an acquittal. No error was committed in that open to our examination. It was proper for the government to show an actual knowledge and understanding on the part of the entry women and the accused of the conditions and requirements essential to the acquisition of the public lands which bore upon the final proofs out of which the offenses grew, the willfully false testimony of the former and the intentional procurement thereof by the latter. A wide latitude in the evidence is permitted to show corrupt motive and intent, particularly when they constitute such an important element of an offense like subornation of perjury. Williamson v. United States, 207 U. S. 425, 28 Sup. Ct. 163, 52 L. Ed. 278. In the case just cited the court quoted the following from Holmes v. Goldsmith, 147 U. S. 150, 13 Sup. Ct. 288, 37 L. Ed. 118:

"The competency of a collateral fact to be used as the basis of legitimate argument is not to be determined by the conclusiveness of the inferences it may afford in reference to the litigated fact. It is enough if these may tend, even in a slight degree, to elucidate the inquiry, or to assist, though remotely, to a determination probably founded in truth."

"The modern tendency, both of legislation and of the decision of courts, is

to give as wide a scope as possible to the investigation of facts. Courts of error are especially unwilling to reverse cases because unimportant and possibly irrelevant testimony may have crept in, unless there is reason to think that practical injustice has been thereby caused."

Complaint is made that the court refused instructions calculated to limit the subornation of perjury to the final proofs by the entry women of their settlement, residence, and cultivation, and that the jury were therefore confused and misled by affidavits received in evidence, but not the subject of the offenses charged. There is no ground for this complaint. The charge of the court was so clear and direct there could have been no misunderstanding, and, when exceptions were taken at its conclusion by counsel for the accused, the court again told the jury the correct limitations. It appears counsel was then satisfied. This disposes of a number of assignments of error relating to alienation, etc., by the entry women, though it may be added that one count, on which there was an acquittal embraced that matter. In the counts on which there was a conviction there was no charge of subornation of perjury with respect to anything but the final proof of settlement, residence, and cultivation of the lands entered. It is also urged that the court erred in refusing requests to instruct upon certain elements essential to subornation of perjury. They were stated to be as follows: (1) A witness must have testified falsely, knowing, or believing the testimony to be false; (2) the accused must have known or believed that the testimony would be false; (3) the accused must have known or believed the witness would give the false testimony with like knowledge or belief; (4) the accused must have induced or procured the witness to do so. The charge of the court upon this matter which we think entirely sufficient is shown by these excerpts:

"In the next place, the testimony given in the final proof proceeding must have been false, and willfully false, and the person testifying must have willfully and contrary to her oath stated or testified to the material matter which she did not believe to be true. It is not sufficient that the testimony may have been false in the sense that it was incorrect, or that it was not the fact, or was given through surprise or confusion or inadvertence, or a bona fide mistake as to the facts; and, to be willful, it must have been intentional, and the person giving the testimony must not have believed that her statement made as being true was true and she must have meant to make the false statement and to have it produce the effect of testimony as though it was true."

"If the testimony or some statement of fact therein was false, then was it willfully false and not believed by the person testifying thereto to be true? If the testimony was false, but yet was not willfully given, or was given under the belief that it was true, there was no perjury."

"If you find that perjury was committed as charged in the indictment, then it will be your duty to proceed to inquire whether the defendant procured the person charged to have been suborned to commit that offense, and is consequently guilty of subornation of perjury. In order to make out this offense against this defendant, it is incumbent upon the government to satisfy you beyond a reasonable doubt that the perjury was in fact committed by the person suborned; that the testimony of the person suborned was willfully false and willfully given contrary to her oath and not by her believed to be true, and the defendant knew or believed that the testimony given would be false; that the defendant knew that the person suborned would willfully testify falsely contrary to her oath, and not believing the testimony to be true; and that the defendant induced or procured the person suborned to give such false testimony."

There were requests for a directed verdict of acquittal, but we think there was substantial evidence of guilt. There were public lands within the extensive inclosure of a ranch of which the accused was resident manager. The motive was to secure these lands for the owners of the ranch. The course pursued was to incite women whose homes were in Kansas to make homestead entries on the lands under agreements to sell when the title was secured. The accused was in charge of the venture and paid all the costs of the proceedings as they were incurred, the expenses of the entry women on their various trips from their homes and their subsistence when on their claims. He put up the little cabins and paid for the meager, temporary furnishing. At times they stopped at the ranch house occupied by him, and were otherwise aided by him in what they did. The jury were justified in believing from the evidence that he was fully aware of their purposes, of all they did and expected to do, and that they had no intention at the time of settlement or afterwards of making the lands their homes; that their occasional visits to the lands did not constitute residence under the law; and that what they did was a mere evasion of its provisions; also, that he knew they would make final proofs and to do so would have to swear falsely, and that they knew they were so swearing when they made the proofs. His advice that they must follow the law may well have been regarded as a subterfuge, because, knowing what the law was, that they were not following it, and that his outlay would come to naught if they testified truthfully at the final proofs, nevertheless he continued his assistance and disbursements to the end.

The judgment is affirmed.

SANBORN, Circuit Judge (dissenting). It is, and for more than a century has been, the established and unvarying rule of the national courts that any law of a state whether of procedure or of punishment passed after the commission of an offense, "which in relation to the offense or its consequences, alters the situation of the party to his disadvantage," is an ex post facto law within the meaning of section 10, art. 1, of the Constitution and violative thereof. United States v. Hall, 2 Wash. (C. C.) 366, Fed. Cas. No. 15,285, pp. 84, 86, 6 Cranch, 171, 3 L. Ed. 189; Kring v. Missouri, 107 U. S. 221, 235, 2 Sup. Ct. 443, 27 L. Ed. 506; In re Medley, 134 U. S. 160, 171, 10 Sup. Ct. 384, 33 L. Ed. 835; Duncan v. Missouri, 152 U. S. 377, 382, 14 Sup. Ct. 570, 38 L. Ed. 485; Thompson v. Utah, 170 U. S. 343, 351, 18 Sup. Ct. 620, 42 L. Ed. 1061; United States v. Haskell (D. C.) 169 Fed. 449, 454; United States v. London (D. C.) 176 Fed. 976, 979; Sharp v. State, 3 Okl. Cr. 24, 104 Pac. 71; State v. Rock, 20 Utah, 38, 43, 44, 57 Pac. 532; State v. Kingsly, 10 Mont. 537, 26 Pac. 1066; McCarty v. State, 1 Wash. St. 377, 25 Pac. 299, 22 Am. St. Rep. 152; People v. Tisdale, 57 Cal. 104.

When the defendant below committed the offense with which he is charged, he could be tried, as the law then stood in Oklahoma Territory, only under an indictment found with the concurrence of 12 members of a grand jury composed of not less than 12 nor more than 16 persons. Statutes of Oklahoma, 1903, §§ 5314, 5316; Reynolds

v. United States, 98 U. S. 145, 25 L. Ed. 244. The Supreme Court of Arkansas had held that under a similar statute an indictment by a grand jury of more than 16 persons was illegal, and must be quashed. Harding v. State, 22 Ark. 210. Subsequent to the alleged commission of the offense and before the trial the people of Oklahoma adopted a Constitution, complied with the enabling act, and were admitted to the Union as the state of Oklahoma, and by virtue of this action section 808, Revised Statutes (U. S. Comp. St. 1906, p. 626), thenceforth became the law for the trial of offenses of this nature, and that section authorized an indictment concurred in by 12 members of a grand jury composed of not less than 16 nor more than 23 persons. The indictment in this case was found by a jury composed of 19 members. Did this change in the law wrought by the adoption of the Constitution of Oklahoma and the admission of that state into the Union after the commission of the offense and before the trial "in relation to the offense or its consequences alter the situation of the accused to his disadvantage"? In my opinion it clearly had that effect (1) because, if the defendant had been indicted under the law as it stood when his offense was committed by a grand jury of 19 men, he could not have been tried or convicted on that indictment (Harding v. State, 22 Ark. 210), while the new law permitted his conviction upon such an indictment; and (2) because under the old law it would have been necessary for him to have only 5 dissenting members of the grand jury to defeat the indictment against him, while under the new law it was necessary for him to have 8.

In Thompson v. Utah, 170 U. S. 343, 345, 352, 18 Sup. Ct. 620, 42 L. Ed. 1061, the offense when committed was triable by a jury of 12 men. By reason of the subsequent admission of Utah into the Union under a Constitution which provided for the trial of criminal cases not capital by a jury of eight persons, the offense was triable by eight men at the time of the trial. The Supreme Court of the United States held that this change in the law of the trial was void as to Thompson and inapplicable to his trial for two reasons: (1) Because it violated section 10 of article 1 of the Constitution, which prohibits the passage by any state of an ex post facto law in that it materially altered the situation of the defendant to his disadvantage in relation to his offense and its consequences (pages 346, 352, of 170 U. S., page 620, of 18 Sup. Ct.; 42 L. Ed. 1061); and (2) because it violated the provisions of article 3, § 2, of the Constitution, and the provisions of the sixth amendment thereto, which guaranteed to him a trial by a jury of 12 men and thus deprived him of "a substantial right involved in his liberty" (pages 346 and 352 of 170 U. S., page 620 of 18 Sup. Ct.; 42 L. Ed. 1061). The fact that in that case the jury of 12 men was secured to the defendant by other provisions of the Constitution than the inhibition of an ex post facto law does not detract in the least from the clear decision by the court of the main question in that case, that the change of the number of the jury by a law or by the adoption of the Constitution of a state between the date of the commission of the offense and the date of the trial materially altered the situation of the accused to his disadvantage and thereby violated the prohibition of an ex post facto law. A law of a state which in rela-

tion to the offense or its consequences alters the situation of the accused as it was fixed by the law at the time of the commission of the offense, though this situation was not secured by the Constitution otherwise than by the prohibition of an ex post facto law, violates that prohibition to the same extent as if the situation was protected by other. clauses of the Constitution. Thus in the case of Medley,. Petitioner, 134 U. S. 160, 171, 10 Sup. Ct. 384, 33 L. Ed. 835, the state law at the time a murder was committed prescribed death as the punishment of the crime, but no provision of the Constitution, except the prohibition of the passage of an ex post facto law, secured to the accused exemption from other punishment. Before the trial of his case, the state enacted a law which added to the punishment of death solitary confinement until execution. But the Supreme Court held this to be an ex post facto law and void. In Kring v. Missouri, 107 U. S. 221, 227, 229, 235, 2 Sup. Ct. 443, 27 L. Ed. 506, the law of the state of Missouri at the time of the murder was that a conviction of a murder·in.the second degree, although subsequently set aside, was an acquittal of murder in the first degree. But there was no provision of the Constitution of the United States except that which forbids any state to pass an ex post facto law which secured to the accused the benefit of this rule of law. After the commission of the offense and before the trial, the state of Missouri by a change in its Constitution abrogated the rule that a conviction of murder in the second degree, avoided, was an acquittal of murder in the first degree. Nevertheless the Supreme Court of the United States held that the change thus wrought by the amendment of the Constitution of the state constituted an ex post facto law, and violated section 10 of article 1. . In this case of Kring v. Missouri the state contended that the new law merely wrought a change in procedure, and hence was not an ex post facto law. · But the Supreme Court denied the proposition and among other things said:

"Can the law with regard to bail, to indictments, to grand juries, to the trial jury, all be changed to the disadvantage of the prisoner by state legislation after the offense was committed and such legislation not be held ex post facto because it relates to procedure, as it does according to Mr. Bishop? And can any substantial right which the law gave the defendant at the time to which the guilt relates be taken away from him by ex post facto legislation, because, in the use of a modern phrase, it is called procedure? We think 'it cannot." 107 U. S. 232, 2 Sup. Ct. 452 (27 L. Ed. 506).

" * * * We are of opinion that any law passed after the commission of an offense which in the language of Mr. Justice Washington in United States v. Hall, 'in relation to that offense, or its consequences, alters the situation of a party to his disadvantage' is an ex post facto law; and in the language of .Denio, J., in Hartung v. People [22 N. Y. 95], 'No one can be criminally punished in this country, except according to a law prescribed for his government by the sovereign authority before the imputed offense was committed, and which existed as a law at the time.'" 107 U. S. 235, 2 Sup. Ct. 455 (27 L. Ed. 506).

The definition of an ex post facto law here quoted from Mr. Justice Washington and, adopted has been reiterated by the Supreme Court in 134 U. S. 171, 10 Sup. Ct. 384, 33 L. Ed. 835, 152 U. S. 382, 14 Sup. Ct. 570, 38 L. Ed. 485, and 170 U. S. 351, 18 Sup. Ct. 620, 42 L. Ed. 1061, and it has never been varied or departed from by that

court. In the consideration of the very question here presented, Judge Marshall in United States v. Haskell (D. C.) 169 Fed. 449, 452, and Judge Campbell in United States v. London (D. C.) 176 Fed. 976, 979, in the United States District Courts, accepted this rule, and held that the new law wrought by the adoption of the Constitution of Oklahoma and the admission of that state which increased the number of the grand jury from 16 to 23, was an ex post facto law, and violative of the Constitution of the United States, and I am unable to persuade myself that they were in error.

True, numerous and varying definitions of an ex post facto law and conflicting applications of the constitutional inhibition may be found in the decisions of the state courts. But the definition and the application have been uniform and changeless in the federal courts. The majority cite to the proposition that the substitution of an information for an indictment is not an ex post facto law, In re Wright, 3 Wyo. 478, 27 Pac. 565, 13 L. R. A. 748, 31 Am. St. Rep. 94, and People v. Campbell, 59 Cal. 243, 43 Am. Rep. 257, and quote from the opinion in the latter case these words:

"It is not uncommon practice to change the number of grand jurors required to investigate criminal charges, but we have never heard the right of the Legislature to make such changes questioned, neither has it ever been claimed that the charge must be investigated by the precise number of grand jurors of which that body was composed at the time the act was committed."

That opinion was written in 1882. If the Supreme Court of California had never heard such changes questioned or such claims made, its decision or opinion concerning them certainly ought not to prejudge the case of the defendant here and now, especially in view of the fact that the courts which have heard of them have in effect decided these questions in his favor in United States v. Haskell (D. C.) 169 Fed. 449, 454; United States v. London (D. C.) 176 Fed. 976, 979; Sharp v. State, 3 Okl. Cr. 24, 104 Pac. 71; State v. Rock, 20 Utah, 38, 43, 44, 57 Pac. 532; State v. Kingsly, 10 Mont. 537, 26 Pac. 1066; McCarty v. State, 1 Wash. St. 377, 25 Pac. 299, 22 Am. St. Rep. 152. Moreover, that court had unanimously decided two years earlier that an information could not be substituted for an indictment between the commission and the trial of the offense (People v. Tisdale, 57 Cal. 104), and it is from an opinion of a court reversing itself by a vote of four to three that the above quotation has been taken. Nor has its later opinion met the approval of the courts of the states, but the weight of authority in those courts is now against it. McCarty v. State, 1 Wash. St. 377, 25 Pac. 299, 22 Am. St. Rep. 152; State v. Rock, 20 Utah, 38, 43, 44, 57 Pac. 532; State v. Kingsly, 10 Mont. 537, 26 Pac. 1066, wherein the Supreme Court of Montana reviews and repudiates the decision in the Campbell Case upon the authority of the decisions of the Supreme Court of the United States which have been cited. In this court those decisions of the Supreme Court must prevail over the conflicting views of state courts. The law prescribing the number of the grand jury and the number of the peremptory challenges was changed between the commission of this alleged offense and the trial of the defendant. If it was changed by the act of the United States, that change was violative of section 9 of article 1 of the Consti-

tution. If that change was wrought by. the act of the people of Oklahoma in adopting their Constitution and making the contract of admission as a state, it was violative of section 10 of article 1 of the Constitution. As I understand the decisions of the Supreme Court, they expressly hold that any law or Constitution of a state enacted or adopted after the commission of an offense which in relation thereto, or to its consequences, alters the situation of the party to his disadvantage, is an ex post facto law and violative of section 10, article 1, of the Constitution, that the adoption of a Constitution by a state, or the admission of a state into the Union, which changes the number of the petit jurors to the disadvantage of the accused after the commission of the offense, constitutes an ex post facto law denounced by the Constitution, and by logical sequence and in legal effect they thereby hold that the increase of the number of grand jurors after the commission of the offense and before the trial by the adoption of a Constitution or the admission of a state alters the situation of the accused relative to the consequences of his offense, and constitutes an ex post facto law within the meaning of the Constitution. Because the decision and opinion of the majority that this change in the number of the grand jurors wrought by the adoption of the Constitution of Oklahoma and its admission as a state does not constitute an ex post facto law seems to me to conflict with these decisions of the Supreme Court, I am unable to concur in them.

There is another consideration here which seems to me to be entitled to much weight. The Criminal Court of Appeals of Oklahoma, construing the Constitution and laws of that state relative to the question in hand, has followed the opinion of Judge Marshall in United States v. Haskell (D. C.) 169 Fed. 449, and has expressly held that the Constitution and laws of Oklahoma do not apply to or govern the procedure for the trial or the trial of crimes committed before they were adopted, because as to the defendants in such cases they are ex post facto laws and that all the proceedings for the trial of such crimes must follow the law in force before the admission of the state when the crimes were committed (Sharp v. State, 3 Okl. Cr. 24, 104 Pac. 71, 72, 73, 74, 77), so that under the ruling of the majority in this case a construction and application of the Constitution and laws of Oklahoma will prevail in cases of this character in the courts of the United States contrary to those which must prevail in the courts of that state under the construction of. the Constitution and laws of that state by its Criminal Court of Appeals to which that construction is exclusively intrusted where such construction does not impair rights secured by the Constitution and laws of the United States, and this construction sedulously protects them.

Again, when the offense in this case was committed the defendant was entitled to five peremptory challenges, while by the Constitution and laws of the state this number was subsequently reduced to three. The court below was in error in my opinion in its refusal to allow to the defendant five peremptory challenges, for the reasons already stated in the discussion of the legal number of the grand jurors.

Because I think the defendant below was tried under an ex post facto law on an indictment found by nineteen grand jurors, 12 of

whom were required to find it, and denied more than 3 peremptory challenges when the law at the time of the commission of his alleged offense limited the number of grand jurors to 16 and required 12 to find the indictment and allowed the accused 5 peremptory challenges, and because I think much immaterial and irrelevant evidence was received on the trial and submitted to the jury, notably the patent to Patricia Thompson which was dated on February 5, 1906, more than three months after all the alleged perjuries were committed and which could have had no tendency to prove the charge that the defendant suborned the witnesses to commit them, the deed of Martha M. Fairley, dated April 12, 1907, more than 16 months after the perjuries the defendant was charged with suborning, and many conversations, contracts, and transactions between third parties and between the defendant and third parties whom he was not charged with suborning to commit any perjury, conversations, transactions, and contracts which it seems to me were exceedingly prejudicial and inadmissible, and whose admission deprived the defendant of a fair trial on this charge of suborning specific persons to commit perjury, and in the absence of any charge of conspiracy, in my opinion the judgment below should be reversed and a new trial granted.

Every litigant has the legal right to a fair and impartial trial of the issues which his case presents according to the law and the evidence relevant to those issues alone. The submission to the jury for their consideration of extraneous issues, or of evidence which is neither relevant nor material to the questions presented by the issues upon trial, is a violation of this legal right, and it constitutes a fatal error because it tends to withdraw the attention of the jury from the issues actually involved and to lead them aside and induce them to decide the case upon false issues, and in that way to reach an erroneous result. Sparks v. Territory of Oklahoma, 146 Fed. 371, 373, 76 C. C. A. 594; Union Pacific Ry. Co. v. Field, 137 Fed. 14, 15, 17, 69 C. C. A. 536, 537, 539; Railroad Company v. Houston, 95 U. S. 703, 24 L. Ed. 542; Railroad Company v. Blessing, 67 Fed. 277, 281, 14 C. C. A. 394, 398; Frizzell v. Omaha Street Ry. Co., 124 Fed. 176, 178, 59 C. C. A. 382, 384; Equitable Life Assur. Society v. McElroy, 28 C. C. A. 365, 376, 83 Fed. 631, 642.