## BACON v. UNITED STATES.

### (Circuit Court of Appeals, Eighth Circuit.   September 25, 1899.)

### No. 1,066.

1. NATIONAL BANKS—FALSE REPORT BY OFFICER—VOLUNTARY REPORTS.

To constitute the offense of making a false report of the condition of a national bank, within Rev. St. § 5209, it is not necessary that such report, when made by an officer of the bank to the comptroller, should have been made in response to a call or request of the comptroller.

2. CONSTITUTIONAL LAW—UNREASONABLE SEARCHES AND SEIZURES.

The constitutional inhibition against unreasonable searches and seizures is a limitation upon the power of the state to make such searches and seizures for its own benefit, and has no reference to the unauthorized acts of individuals.

3. NATIONAL BANKS—PROSECUTION OF OFFICERS—EVIDENCE UNLAWFULLY OBTAINED.

The fact that a letter written by the comptroller of the currency to the president of a national bank, which formed a part of the official correspondence of the bank, was taken by some individual from a box marked as containing private papers of the president, and was afterwards given to the officers of the United States, does not render such letter inadmissible in evidence on the part of the government in a prosecution of the president for a violation of the national banking laws.

4. SAME.

Books of a national bank, which were turned over to officers of the United States by the receivers of a state bank which succeeded such national bank, are not inadmissible in evidence on behalf of the government in the prosecution of an officer of the bank for a violation of the national banking law on the ground that they were unlawfully obtained in violation of the constitutional provision against unreasonable searches and seizures.

5. SAME—BOOKS OF BANK AS EVIDENCE.

In view of the provisions of the national banking act requiring the books of a national bank to be truthfully kept, by making it an offense to make false entries therein, proof that books are those of a national bank in which the record of its daily business was kept raises a presumption that they were properly kept, which renders them admissible in evidence without further proof, when offered by the government in a criminal suit against an officer of the bank for making false reports.

6. SAME—FALSE REPORTS—EVIDENCE OF INTENT.

On the trial of the president of a national bank, charged with having made a false report of its condition to the comptroller, prior reports, attested by him, containing false statements, together with testimony that such misstatements were called to his attention by an examiner prior to his making the report in question, are admissible on the question of intent.

7. SAME—OVERDRAFTS—OVERDRAFT NOTES.

Where the account of a depositor with a national bank shows that he has drawn out more money than has been credited to him, the excess constitutes an overdraft, and is required to be so reported in the bank's statement to the comptroller.   The fact that the depositor has given the bank a note to secure overdrafts, where it has not actually been discounted, and the proceeds placed to his credit on the books, does not warrant the reporting of such overdraft under the head of "loans and discounts."

8. SAME—EVIDENCE—HARMLESS ERROR.

The admission of expert testimony as to the meaning of certain entries in a report made by a national bank to the comptroller is not prejudicial error, conceding the construction of the report to be properly a matter of law for the court, where it appears that the witnesses correctly interpreted such entries.

In Error to the Circuit Court of the United States for the District of Utah.

George Sutherland and John M. Zane (Hiram E. Booth, on the brief), for plaintiff in error.

John W. Judd, for the United States.

Before CALDWELL, SANBORN, and THAYER, Circuit Judges.

THAYER, Circuit Judge. James H. Bacon, the plaintiff in error, was indicted and tried in the circuit court of the United States for the district of Utah for certain offenses denounced by section 5209 of the Revised Statutes of the United States. The indictment under which he was tried contained eight counts, but at the conclusion of the evidence the court withdrew from the consideration of the jury the first, second, fifth, and seventh counts, and a conviction was had on the third and fourth counts only. The charge contained in the third and fourth counts, of which the accused was found guilty, was, in substance, that in a report made by him, as president of the American National Bank of Salt Lake City, to the comptroller of the currency, on December 28, 1893, which purported to show the true condition of said bank on December 19, 1893, he had stated under oath that the sum due from individual depositors to said bank on account of overdrafts was only $5,755.93, whereas in truth and in fact the amount then due on account of overdrafts was $14,479.82, as the defendant well knew, and that such false report was made with intent to injure and defraud said bank, and to deceive any agent who might be appointed by the comptroller of the currency to examine its affairs. It was admitted by the defendant below in the course of the trial— and concerning that fact there was no controversy—that the books of the American National Bank of Salt Lake City showed overdrafts on the part of individual depositors at the close of business on December 19, 1893, which amounted in the aggregate to $14,479.82. But it was claimed by the defendant that certain depositors whose accounts appeared to be overdrawn at that time to the amount of $8,723.89 had theretofore executed and delivered notes to the bank to cover any possible overdraft of their respective accounts which might subsequently occur, and that in making up his report to the comptroller on December 28, 1893, the defendant had deducted the latter sum from the total amount of the overdrafts as disclosed by the books, and had reported it to the comptroller of the currency under the head of loans and discounts, although the so-termed overdraft notes had not in fact been discounted, and the proceeds thereof passed to the credit of the respective makers on the books of the bank. The defendant further claimed that he had so reported a portion of the overdrafts amounting, as aforesaid, to $8,723.89, because he had been advised previously by a bank examiner by the name of Lazear that that was the proper way to report overdrafts when the bank held notes representing the same, and that he had so acted in the utmost good faith without criminal intent. He was contradicted on this point, however, by Lazear, from whom he claimed to have

received the aforesaid advice; the latter testifying, in substance, that previous to the commission of the alleged offense he had given no such advice to the accused, but had instructed him, on the contrary, that advances to customers appearing on the books as overdrafts should be so reported to the comptroller of the currency. The trial judge allowed the jury to decide this controverted issue of fact. He also allowed the jury to determine, in the light of all the testimony, whether the bank, on December 19, 1893, did in fact hold notes to the amount of $8,723.89, representing a portion of the aggregate overdraft which the books then disclosed; and he instructed the jurors, in substance, that if they believed that a portion of the overdraft was thus reported by the accused as loans and discounts, in pursuance of an honest belief that that was the proper way to report them in making the report complained of, then there was no such intent to defraud or deceive as would support a conviction. In view of these facts, we must assume either that the jury disbelieved the testimony tending to show that the bank held notes as claimed on December 19, 1893, representing a portion of the overdraft, or that they found that, even if the bank did hold such notes, the accused was well aware that the entire overdraft disclosed by the books on that day should have been reported as an overdraft, and that the evidence established an intent on the part of the defendant either to deceive or defraud.

With this explanation of the general features of the case, we proceed to consider the alleged errors that have been called to our attention. When the prosecution, to sustain the issue on its part, offered in evidence the copy of the report referred to in the indictment, purporting to show the condition of the American National Bank of Salt Lake City on December 19, 1893, which was duly authenticated under the hand and official seal of James H. Eckels, comptroller of the currency, and in connection therewith offered the original report, the signature of the defendant to the original report seems to have been admitted by his counsel to be genuine. Both the original report and the copy thereof were objected to, however, by the defendant below on the ground that the prosecution had not shown that the report was made in pursuance of a request therefor regularly issued by the comptroller of the currency, which objection was by the court overruled, and an exception was saved. Section 5211 of the Revised Statutes requires every national banking association to make not less than five reports each year to the comptroller of the currency, according to a form prescribed by that officer, which reports, as the statute declares, must be verified by the oath or affirmation of the president or cashier of the association in whose behalf the report is made, and attested by the signature of at least three of its directors. The statute further provides that such reports shall be transmitted within five days after the receipt of a request therefor from the comptroller, and that the latter officer shall have power to call for special reports whenever, in his judgment, the same are necessary. The objection to the report which was made by the defendant was, in substance, that it had not been shown that the report was made in

obedience to a requisition from the comptroller, the claim being that by the provisions of section 5209 of the Revised Statutes, under which counts 3 and 4 of the indictment were framed, no offense is committed if a bank officer does make a false report to the comptroller of the currency in relation to the condition of the bank, unless the report is made in obedience to a request from the latter officer. It will be observed that section 5209, in defining the offense of making a false report, contains no such limitation as that sought to be imposed. The language of the law is general that "every president, director, cashier, teller, clerk or agent of any association    *    *    * who makes any false entry in any book, report or statement of the association, with intent," etc., "shall be deemed guilty of a misdemeanor,    *    *    *" which language may as well include a false report voluntarily made by a bank official to the comptroller of the currency to influence his action, and accomplish some fraudulent purpose, as a false report made in pursuance of a call or request from that officer. We perceive no reason why a false report or statement made voluntarily to the comptroller of the currency in relation to the condition of a national bank for the purpose of inducing some action on the comptroller's part, or of forestalling certain action which he contemplates taking, should not be deemed an offense, as well as the making of a false report pursuant to a call or request from that officer, provided the act is done with the intent specified in the statute. The law was designed, we think, to prevent bank officials and employés from making any false entry in the books of the bank, and from making any false representations concerning its financial condition and resources in any report or statement which they may see fit to make in behalf of the bank to the comptroller of the currency, or to persons appointed to examine its condition, for the purpose of influencing their action. The reasons given in U. S. v. Booker, 80 Fed. 376, for holding that the report referred to in section 5209 is not restricted to the reports specified in sections 5211, 5212, but comprehends as well other reports made in behalf of national banking associations, commend themselves to our judgment as in all respects sound. Moreover, if it should be conceded that section 5209 has reference only to false reports that are made to the comptroller pursuant to his request, we should nevertheless feel constrained to hold that, when the report in this case was admitted in evidence, the proof was adequate to create a presumption that the report had been made in obedience to a request from the comptroller, and that no further evidence on that point was necessary to warrant its admission. It emanated from a high public office. It was made on a form that had been prescribed by the comptroller of the currency for use by national banks when reports as to their condition were called for. The copy of the report was duly authenticated under the hand and seal of that officer as a copy of an original report, properly on file in his office; and upon the assumption that the law affords no warrant for the making and filing of such reports in the office of the comptroller without a precedent request a presumption naturally arose from the fact that the report had been

accepted and filed that it had been duly called for by the comptroller. We think, therefore, that the objection to the introduction of the report was rightly overruled.

Misbehavior of the attorney for the United States in the presence of the jury is next relied upon to secure a reversal of the judgment below. This charge is predicated upon the following occurrence: In the course of the trial a letter from the comptroller of the currency to James H. Bacon, the defendant, as president of the American National Bank, was offered in evidence by the government; and upon its being established to the satisfaction of the court that the letter had been taken by force from a locked box marked "James H. Bacon. Private Papers," while the box was in the custody of officers of the law of the state of Utah, and that it had subsequently been turned over to the United States district attorney, the court ruled that the letter was inadmissible. Thereupon the attorney for the prosecution laid the letter upon the table before the defendant's attorney, and asked him to produce it. The trial judge ruled that the defendant could produce it or not, as he might elect, and in view of that ruling the letter was not read. Such was the misconduct of the attorney on account of which complaint is made. Other portions of the record disclose the following facts which are pertinent to the exception now under consideration: The American National Bank of Salt Lake City ceased doing business on February 24, 1894, and on that day turned over all of its books, papers, and assets to the defendant below, who immediately organized a state bank known as the Bank of Salt Lake, and in this way the papers, books, and assets of the defunct institution passed into the custody of the newly-organized state bank. The latter bank subsequently became embarrassed, and receivers thereof were duly appointed in the course of legal proceedings instituted against it in the courts of the state. These receivers, having obtained possession of the books and papers of the American National Bank, including the aforesaid letter addressed by the comptroller of the currency to its president, gave the federal authorities access thereto when an investigation into the affairs of the last-named bank was inaugurated, which resulted in an indictment being returned against the defendant. In the course of this investigation all of the books and papers in question passed into the custody of the United States marshal for the district of Utah, with the consent of the receivers of the state bank, where they remained until they were used upon the trial of the defendant in the lower court. Upon this state of facts we think that the complaint made of the misconduct of the attorney for the United States is without merit, and that the objection subsequently made to the use of the books and papers of the American National Bank as evidence against the accused, because of the manner in which they had been obtained by the prosecution, is equally untenable. The letter which was written by the comptroller of the currency to the defendant as president of the American National Bank was admissible in evidence against the defendant if it threw any light upon the acts charged in the indictment, and the ruling of the learned trial judge in excluding it would seem to have

been erroneous, in view of all the facts which the bill of exceptions discloses. It was in no sense a private paper of the defendant, because it was addressed to him as president of the American National Bank, and formed a part of the official correspondence between the comptroller and said bank; and although it be true that some one had extracted it from a locked box marked "James H. Bacon. Private Papers," while the box was in the possession of the receivers of the Bank of Salt Lake, yet, as no officer of the government was concerned in that act, we are of opinion that such fact did not affect its admissibility. It is held very generally that, if an individual by an illegal search or seizure obtains possession of an article or document, the state may nevertheless make use of the same as evidence against the person from whom they were wrongfully obtained to convict him of a crime; and that the inhibition found in article 4 of the amendments to the federal constitution, and in many state constitutions, against unreasonable searches and seizures is a limitation upon the power of the state to make such searches and seizures for its own benefit, and has no reference to unauthorized acts of individuals. Gindrat v. People, 138 Ill. 103, 27 N. E. 1085; Shields v. State, 104 Ala. 35, 16 South. 85; Com. v. Dana, 2 Metc. (Mass.) 329, 337; State v. Flynn, 36 N. H. 64; 1 Greenl. Ev. § 254a, and cases there cited. This, in our opinion, is a reasonable doctrine, when we remember that the common law has always afforded ample remedies for illegal acts committed by individuals, and that the inhibition against unreasonable searches and seizures found in the organic law owes its origin to acts of that nature which at one time were frequently committed by the sovereign on the pretense that they were necessary for his own protection or the protection of the state. If it be true, then,—as we think it is,—that the letter in question was admissible against the defendant notwithstanding the manner in which it had fallen into the hands of the government, it can scarcely be pretended that the action of the attorney for the United States in laying it down on the counsel table, and then calling for its production, was such misconduct on his part as would justify a reversal of the judgment. There is even less reason for holding that the books of the American National Bank had come into the possession of the government in such a way that they could not be used against the accused for the purpose of convicting him of a crime.

The books of the bank, when they were offered in evidence by the government were further objected to by the defendant below on the ground that no testimony had been adduced to show that they had been properly kept. This objection was overruled, and error is assigned on account of that ruling. The government did prove, however, that the books in question were the books of the American National Bank, in which it had been accustomed to keep a record of its daily business transactions, and that the books had been kept according to what is known as the "Boston System" of bookkeeping, by which system original entries are made on slips called "debit" and "credit" slips. The defendant against whom the books were offered was the chief executive officer of the bank, and as such actu-

ally had control and direction of its affairs while it was a going concern. Besides, the act of congress under which the bank was organized in effect enjoined that its books should be truthfully kept, since section 5209 of the Revised Statutes, heretofore cited, made it an offense, punishable by imprisonment, for any officer or agent of the bank to make any false entry in its books. In view of these considerations, we are of opinion that a presumption existed that the books in question had been truthfully or properly kept, and that it was unnecessary to fortify that presumption with additional proof, when the books were produced, and proved to be the regular books of account of the bank. We have no fault to find with the rule which is enunciated in some cases that the books of a corporation cannot be used by the corporation without independent evidence showing that they are correct, for the purpose of establishing an indebtedness to itself on the part of its stockholders or directors. Rudd v. Robinson, 126 N. Y. 113, 26 N. E. 1046. But we are unwilling to sanction the doctrine that in a proceeding against the president of a national bank to convict him of making a false report to the comptroller of the currency concerning its financial condition the books of the bank, although properly identified as such, cannot be used by the prosecution as evidence to show its condition, without first producing other evidence to show that they have been truthfully kept, and are in all respects correct. This latter rule would impose a burden upon the government which it should not be compelled to assume. Inasmuch as the act under which national banks are organized makes it the duty of all officers and employés of such institutions to make no entries in their books except such as are correct and truthful, the government should be entitled to rely upon the presumption that such duty has been faithfully performed until the contrary thereof is established.

We have next to consider an exception that was saved to the admission of three reports to the comptroller of the currency concerning the condition of the American National Bank of Salt Lake City, which were made respectively in behalf of the bank on July 12, 1892, May 4, 1893, and July 12, 1893, and antedated the report on which the indictment was based. These reports, though admitted in evidence, are not set forth in the bill of exceptions, which only contains fragmentary portions of certain oral testimony that seems to have been given in relation thereto by a bank examiner by the name of Lazear. An appellate court would probably be justified in refusing to notice the exception in question because of the imperfect condition of the record. We have, however, considered such of the testimony as has been preserved, with a view of ascertaining, as best we may, what influence these reports and the oral testimony in relation thereto may have had upon the result of the trial, and whether it appears with sufficient certainty that a prejudicial error was committed. The bill of exceptions shows that Lazear examined the American National Bank in September, 1893; that in the course of such examination he had the aforesaid reports in his possession, and compared them with the books of the bank, to ascertain if they were

correct, and corresponded with the books at the time they purported to have been made; that in the course of that examination he conferred frequently with the defendant, Bacon, who was at the time president of the bank, and had attested the reports, and called his attention to mistakes therein, by reason of which they did not reflect the true condition of the bank as shown by its books. The record does not clearly disclose all of the alleged mistakes that were so pointed out, because the reports and much of the testimony in relation thereto have been omitted. It must be presumed, however, in aid of the judgment below, that they were made clear to the trial court by means of the reports and oral testimony. Enough appears in the bill of exceptions to satisfy us that one of the alleged mistakes to which the defendant's attention was especially called by Lazear consisted in a manipulation of the cash in one of the reports, by means of which the amount of cash on hand was exaggerated to the extent of $3,017.50 by reporting an overdraft to that amount as cash actually on hand. Lazear testified that he called the defendant's attention to this item in the report, and advised him at the time that it was a false entry. It is obvious that the reports to which the objection was addressed, the testimony of Lazear in relation thereto, and his conversations with the defendant concerning the same, were admitted by the trial court solely for the purpose of enabling the jury to decide with what intent any false entry found to be contained in the subsequent report of December 28, 1893, was made by the accused. The trial court charged the jury, in substance, that such was the purpose of its admission, and that the defendant was not on trial for, and could not be convicted of, making a false report other than the one charged in the indictment. The instructions in this particular were in all respects fair and correct. The conclusion which we have formed on this branch of the case is that the trial court was justified in admitting the aforesaid reports in connection with the oral testimony of Lazear in relation thereto, because of the tendency of the evidence to establish the purpose with which the acts charged in the indictment were committed. The false report alleged in the indictment was made within four months succeeding the examination of the bank by Lazear, and if it be true that in the course of that examination the defendant's attention was directed to false statements contained in previous reports which he had attested, such testimony would have a natural tendency to convince a jury that the false report complained of in the indictment was not due to ignorance or inadvertence, but was inspired by a fraudulent purpose. This court approved of the admission of similar testimony for the purpose of establishing guilty knowledge in the recent case of Dow v. U. S., 49 U. S. App. 605, 27 C. C. A. 140, and 82 Fed. 904, 909, and upon the assumption which we are forced to make in view of the condition of the record that the reports and testimony of Lazear in relation thereto showed errors and inaccuracies therein to which defendant's attention was invited, no doubt can be entertained that the evidence to which the exception was taken was properly admitted. Allis v. U. S., 155 U. S. 117, 119, 15 Sup. Ct. 36.

A further exception was noted by the defendant's counsel to a portion of the charge of the trial judge wherein he instructed the jury, in substance, that an overdraft arises when a customer of a bank draws from that bank more money than is standing to his credit in his account with the bank; that such a sum so appearing from a depositor's account to be overdrawn is an overdraft, and should be reported as such in reports made to the comptroller of the currency, although arranged for or covered by a note in the hands of the bank, called an "overdraft note." It is urged that this instruction was erroneous; that, whenever a bank takes a note to secure a possible overdraft in a depositor's account, any sum subsequently overdrawn by the depositor not exceeding the amount of the note should be reported, not as an overdraft, but as a loan or discount; and that the instruction was highly prejudicial to the defendant because if it was true, as he claimed, that the bank held overdraft notes to the amount of $8,723.89 on December 19, 1893, then the aggregate overdraft on that day was correctly reported, no matter what the books of the bank may have shown. The definition of the term "overdraft" which was given by the trial judge is substantially the same as the one formulated by Judge Sanborn in U. S. v. Allis, 73 Fed. 175, 178, and we think that it was correct, as applied to the state of facts disclosed by the present record, inasmuch as it was not claimed that any of the so-called "overdraft notes," if the same actually existed, had ever been discounted by the bank, and the proceeds thereof carried to the credit of the makers. When a depositor's account with a bank shows that he has drawn and been charged with more money than he has deposited, or more than has been placed to his credit on the books of the bank, it is usually said that his account is overdrawn, and that an overdraft exists. This is the ordinary meaning of the word "overdraft," as used among bankers. It must be presumed, therefore, that when the comptroller of the currency calls upon a national bank for a report of its condition, and, as in the case at bar, asks for a statement of the amount of overdrafts "secured" and "unsecured," he uses the word in the sense last indicated, and desires a statement of the total amount which customers of the bank have drawn in excess of the sums that have been placed to their credit on the books of the bank. Loans that a depositor effects by overdrawing his account are very different from those effected in the usual course of business by discounting commercial paper, and it is doubtless true that the practice of requiring a particular statement of irregular loans of that character in reports made to the comptroller is due to the fact that, if they are shown to be large, they excite suspicion, and tend to impair confidence in the management of the bank, and to insure greater watchfulness on the part of the comptroller. We think, therefore, that when that officer calls upon a bank for a statement of overdrafts, the report, to be truthful, and in conformity with law, should include overdrafts covered by what are termed "overdraft notes," unless such notes have been discounted, and the proceeds thereof actually carried to the credit of the depositor on the books of the bank. It follows from what has been said that the instruction complained of was prop-

erly given, and that the case was properly left to turn on the intent which had actuated the defendant in misrepresenting the amount of the overdrafts.

Some other exceptions were noted during the trial, which are of less importance than those heretofore considered, and need not be spoken of at length, although they have received due attention. Among the number is one which was taken to the trial court's definition of the phrase "reasonable doubt," but, as the definition given was, in substance, the same as one that was approved in Dunbar v. U. S., 156 U. S. 185, 15 Sup. Ct. 325, the exception cannot be regarded as tenable. A president of another national bank in Salt Lake City, who was familiar with reports made by such banks to the comptroller of the currency, and also with the forms upon which such reports are required to be made, was called by the prosecution to testify as an expert as to the meaning or signification of certain entries in the report of date December 28, 1893, on which the indictment in the present case was based. An exception was taken to the admission of this testimony, and to the admission of similar testimony given by another witness, on the ground that it was not a proper subject-matter for expert testimony, the document being in writing, and the proper interpretation thereof being, as it is claimed, a matter of law for the court. With reference to this criticism it is sufficient to say that it is not suggested that the witnesses in question misinterpreted any of the entries in the report, and to our mind it is obvious that they did not do so. Therefore, if it should be conceded that the duty of construing the report rested upon the court, yet it is clear that no harm was done by admitting the testimony, of which the accused is entitled to complain. Upon the whole, we have reached the conclusion that no legal cause is disclosed by the record for disturbing the judgment of the lower court. We should have been better pleased with the result if the sentence imposed had been less severe, but we are not authorized to review the action of the lower court in that respect. It must also be borne in mind that the more full and accurate knowledge of all the facts and circumstances attending the commission of the offense which was possessed by the trial judge enabled him, probably, to better determine what was adequate punishment. The judgment below is accordingly affirmed, and the defendant below is hereby ordered to surrender himself to the custody of the United States marshal for the district of Utah on the filing, of the mandate in execution of the sentence heretofore imposed by the trial court.