## PHILLIPS v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. November 21, 1912.)

No. 3,700.

1. CRIMINAL LAW (§ 101*)—COURTS—JURISDICTION.

Under Enabling Act Okl. June 16, 1906, c. 3335, § 16, 34 Stat. 276, as amended by Act March 4, 1907, c. 2911, § 1, 34 Stat. 1286, providing that prosecutions, pending in the district courts of the territory of Oklahoma or in the United States courts in the Indian Territory on the admission of Oklahoma as a state, shall be transferred to the proper United States District Court and proceeded with, the record of a criminal prosecution pending in the United States court for a district of the Indian Territory at the time of the admission of Oklahoma as a state is properly certified to the District Court of the United States by the clerk of the state district court as successor of the United States court, where the indictment, subpœna, petition for transfer, and order of transfer are certified and transmitted to the proper District Court, and it has jurisdiction of the prosecution.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 199–205; Dec. Dig. § 101.*]

2. JURY (§ 47*)—SUMMONING JURY—DISTRICT.

Under Enabling Act Okl. June 16, 1906, c. 3335, § 16, 34 Stat. 276, as amended by Act March 4, 1907, c. 2911, § 1, 34 Stat. 1286, authorizing the transfer to the United States District Court of prosecutions pending on the admission of Oklahoma as a state, to be proceeded with in the District Court as if originally brought therein, one indicted in the United States court for a district of the Indian Territory may not complain. on the transfer of the prosecution to the District Court for the Eastern District of Oklahoma, that the jurors, with the exception of one, were drawn from that portion of the Eastern District of Oklahoma which did not include any part of the old district of the Indian Territory.

[Ed. Note.—For other cases, see Jury, Cent. Dig. § 254; Dec. Dig. § 47.*]

3. CRIMINAL LAW (§ 576*)—PRIVILEGES OF ACCUSED—SPEEDY TRIAL.

One may not acquiesce in the postponement of his trial for crime from time to time, and then insist on the dismissal of the prosecution, because he has not been given a speedy trial, as guaranteed by Const. U. S. Amend. 6.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 1297–1304; Dec. Dig. § 576.*]

4. CRIMINAL LAW (§§ 301, 1149*)—LEAVE TO WITHDRAW PLEA OF NOT GUILTY AND FILE DEMURRER—DISCRETION OF TRIAL COURT.

The refusal of the trial court to allow accused to withdraw his plea of not guilty and file a demurrer to the indictment is within the sound discretion of the trial court, and will not be disturbed in the absence of an abuse of discretion.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 687, 3014, 3015, 3020, 3022, 3023; Dec. Dig. §§ 301, 1149.*]

5. BANKS AND BANKING (§ 257*)—FALSE ENTRY IN REPORT TO COMPTROLLER OF CURRENCY—INDICTMENT—SUFFICIENCY.

An indictment alleging that accused made a false entry in a report to the Comptroller of the Currency of the condition of a national bank at the close of business on a designated date, and that the report showed that the balance due to the bank from another bank on that date was $21,007.97, when in truth and in fact the balance was only $14,895.97, sufficiently charges a violation of Rev. St. § 5209 (U. S. Comp. St. 1901,

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

p. 3497), punishing the making of false reports, when attacked by motion in arrest.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 965, 966, 970–976; Dec. Dig. § 257.*]

6. BANKS AND BANKING (§ 257*)—"FALSE ENTRY" IN REPORT TO COMPTROLLER OF CURRENCY—INDICTMENT—ISSUES, PROOF, AND VARIANCE.

The variance between an indictment. alleging that accused made a false entry in a report to the Comptroller of the Currency of the condition of a national bank. so as to show the balance due the bank from another bank as $21.007.97, when in truth and in fact the balance was only $14,895.97, and the proof that the true balance due was $14,947.68, is immaterial; the gist of the offense being the making of a "false entry" knowingly and with intent to deceive, and the exact amount of the balance stated to be due not being material.

[Ed. Note.—For other cases, see Banks and Banking, Cent. Dig. §§ 965, 966, 970–976; Dec. Dig. § 257.*

For other definitions, see Words and Phrases, vol. 3, pp. 2656, 2657; vol. 8, p. 7660.]

.7. BANKS AND BANKING (§ 257*)—FALSE ENTRY IN REPORT TO COMPTROLLER OF CURRENCY OF CONDITION OF NATIONAL BANK—CRIMINAL PROSECUTION —EVIDENCE—ADMISSIBILITY.

On a trial for having made on September 4, 1906, a false entry in a report to the Comptroller of the Currency of the condition of a national bank at the close of business on that date, so as to falsely show the balance due it from another bank, the admission of evidence that accused in October following admitted a shortage in his accounts, and that he thought that most of it was in the account of such bank, to throw light on the question as to whether accused knowingly made the false entry, was not erroneous.

[Ed. Note.—For other cases. see Banks and Banking, Cent. Dig. §§ 965, 966, 970–976; Dec. Dig. § 257.*]

8. CRIMINAL LAW (§ 434*)—EVIDENCE—PRIVATE RECORDS.

On a trial for making a false entry in a report to the Comptroller of the Currency of the condition of a national bank by showing a false balance due the bank from another bank, the books of the latter bank are inadmissible in evidence, in absence of the testimony of some person who either has some knowledge of the correctness of the entries made in the books, or some knowledge of the original transaction on which the entries were founded; and the mere fact that the laws of the United States make it a crime to make false entries in the books of a national bank does not make the books prima facie evidence of their contents, simply on their being identified as bank books, but their admissibility is determined by the rule governing the admission of entries in private books of account.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. § 1023; Dec. Dig. § 434.*]

9. CRIMINAL LAW (§ 402*)—EVIDENCE—CONDITION OF BOOKS OF ACCOUNT— EXPERT TESTIMONY.

Expert testimony of a summary of books of account and documents is admissible, where the items are multifarious and voluminous, and of a character to render it difficult for the jury to comprehend material facts; but. before such expert testimony may be given, the books or documents must be public records, or, if private books of account or documents, sufficient evidence must first be given to admit the books or documents themselves in evidence, unless the books or documents are admitted to be correct.

[Ed. Note.—For other cases, see Criminal Law, Cent. Dig. §§ 887, 888; Dec. Dig. § 402.*] .

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Error to the District Court of the United States for the Eastern District of Oklahoma; Ralph E. Campbell, Judge.

W. P. Phillips was convicted of crime and he brings error. Reversed and remanded for new trial.

B. T. Hainer, of Tulsa, Okl., and William P. Thompson, of Vinita, Okl., for plaintiff in error.

William J. Gregg, U. S. Atty., of Tulsa, Okl.

Before SANBORN and CARLAND, Circuit Judges, and W. H. MUNGER, District Judge.

CARLAND, Circuit Judge. Phillips was indicted on June 12, 1907, in the United States Court for the Northern District of the Indian Territory, held at Vinita, for a violation of section 5209, Rev. Stat. (U. S. Comp. St. 1901, p. 3497). In substance, the indictment charged him with having made a false entry in a report to the Comptroller of the Currency of the condition of the First National Bank of Vinita at the close of business on the 4th day of September, 1906. The report was alleged to be false, in that it showed the balance due from the Hanover National Bank, New York, to the First National Bank of Vinita, on September 4, 1906, as $21,007.97, when in truth and in fact said balance was only $14,895.97. Upon trial, a verdict of guilty was rendered by the jury, and Phillips was thereupon sentenced to the penitentiary for five years.

On June 20, 1907, a plea of not guilty was entered to the indictment. November 16, 1907, the state of Oklahoma was admitted to the Union. December 19, 1907, the United States attorney for the Eastern district of Oklahoma filed a petition in the district court for Craig county, Second judicial district of Oklahoma, praying that an order of that court might be entered removing said case from the district court of Craig county, Okl., to the District Court of the United States for the Eastern District of Oklahoma. On December 20, 1907, the prayer of this petition was granted, and the indictment, subpœna, petition for transfer, and order of transfer were duly certified and transmitted to the United States District Court for the Eastern District of Oklahoma.

Section 16 of "An act to enable the people of Oklahoma and of the Indian Territory to form a constitution and state government, etc." (Act June 16, 1906, c. 3335, 34 Stat. 276), provided:

"That all causes pending in the supreme and district courts of Oklahoma Territory and in the United States courts * * * in the Indian Territory * * * in which the United States may be a party * * * shall be transferred to the proper United States Circuit or District Court for final disposition."

Said section 16 was amended by Act March 4, 1907, c. 2911, 34 Stat. 1286, by adding, after the word "disposition":

"And shall therein be proceeded with in the same manner as' if originally brought therein."

Section 16, as amended, further provided:

"Prosecutions for all crimes and offenses committed within the territory of Oklahoma or in the Indian Territory, pending in the district courts of the

territory of Oklahoma or in the United States courts in the Indian Territory upon the admission of such territories as a state, which, had they been committed within a state would have been cognizable in the federal courts, shall be transferred to and be proceeded with in the United States Circuit or District Court established by this act for the district in which the offenses were committed, in the same manner and with the same effect as if they had been committed within a state."

[1] The case against Phillips was continued from time to time, sometimes at his own request, and at other times seemingly abandoned by both parties, until May 9, 1911, when the case was moved for trial at Tulsa, in the Eastern district of Oklahoma. At this time, counsel for Phillips moved the court to dismiss the case for want of jurisdiction, for the reason that the record had not been properly certified from the court in which the indictment was found, or its successor, the district court for Craig county, Second judicial district of Oklahoma. The motion was overruled and an exception taken. There is no merit whatever in this contention, as the record, taken in connection with the law providing for the transfer of the case, shows it was properly transferred.

[2] It appears from the record that the jurors, with the exception of one, were drawn from that portion of the Eastern district of Oklahoma which did not include any portion of the old Northern district of the Indian Territory. These jurors were challenged, and, upon the challenges being disallowed, exception was taken to the ruling of the court in reference thereto. In view of the acts of Congress hereinbefore quoted, we think there was no error in this action of the court, especially in view of the decisions in Billingsley v. United States, 178 Fed. 653, 101 C. C. A. 465, Cook v. United States, 138 U. S. 157, 11 Sup. Ct. 268, 34 L. Ed. 906, and Hallock v. United States, 185 Fed. 417, 107 C. C. A. 487.

[3] Counsel for Phillips also moved the court to dismiss the case and discharge the defendant, because the United States had failed to bring him to trial at an earlier date. This motion was also overruled. The sixth amendment to the Constitution of the United States provides that the accused shall enjoy the right to a speedy and public trial; but the record does not show that Phillips ever asked for a trial during the four years that the indictment was pending, and we do not think a defendant can acquiesce in the postponement of his trial, and then, when the same is called, move that the case be dismissed because he had not been given a speedy trial. It is his duty, if he wants a speedy trial, to ask for it; and we must presume that he would have been granted an earlier trial if he had so asked. There was no error in the ruling of the court in this respect.

[4] The refusal of the court to allow the defendant to withdraw his plea of not guilty and file a demurrer to the indictment was within the sound discretion of the court, and we see no abuse of discretion.

[5] The sufficiency of the indictment was raised by motion in arrest, and the motion was overruled. Judged by the statute under which the indictment was returned, and the cases of United States v. Britton, 107 U. S. 655, 2 Sup. Ct. 512, 27 L. Ed. 520, and Harper

·v. United States, 170 Fed. 385, 95 C. C. A. 555, the indictment was clearly sufficient.

[6] At the close of all the evidence counsel for defendant moved for a directed verdict, on the ground that there was a variance between the indictment and the evidence. It appeared in evidence that the true balance due from the Hanover National Bank to the First National Bank on September 4, 1906, was $14,947.68, instead of $14,-895.97, as alleged in the indictment. This was an immaterial variance. The gist of the offense was the making of a false entry, knowingly and with intent to deceive, the exact amount of the balance stated to be due was not material, and the defendant could not have been misled or surprised in any way by the proof. United States v. Harper (C. C.) 33 Fed. 471; Flickinger v. United States, 150 Fed. 1, 79 C. C. A. 515; United States v. Graves (D. C.) 53 Fed. 634; Richardson v. United States, 181 Fed. 1, 104 C. C. A. 69; Daniels v. United States (C. C. A.) 196 Fed. 459. It follows, also, that the court did not err in refusing to instruct in this matter as requested by counsel for defendant, and no exceptions were taken to the charge as given.

[7] Certain witnesses were allowed to give testimony, over the objection of counsel for the defendant, to the effect that the defendant, on Octobr 9, 1906, had admitted that he was short in his accounts, and that he thought most of it was in the account of the Hanover National Bank. The defendant was charged with having made a false entry on· September 4, 1906, and it is a close question as to whether or not this testimony concerning admissions of defendant made on October 9, 1906, tended in any way to prove the commission of the offense with which he was charged. It was admitted by the court on the theory that it would furnish a motive for the defendant to make the false entry, and that it would be some evidence that he made the entry knowing it to be false. The court in its charge limited the effect of the evidence, so far as it could, by telling the jury that the defendant was not charged with embezzlement or misapplication of the bank's funds, and that· they should only consider the admissions of the defendant in so far as they would throw light upon the question as to whether the defendant knowingly made the false entry with which he was charged. We think, upon the whole, that as limited by the court it was not error to receive this evidence.

[8] Two· books of account, a register and a journal, of the Hanover National Bank, were admitted in evidence over the objection and exception of counsel for the defendant, and the court charged the jury that these books were presumed to be correctly kept until the contrary was shown. The following testimony is all the foundation ·that was laid for their admission:

Frank E. Wheeler was called as a witness for the prosecution, and testified as follows:

"Q. Are you in any way associated with the Hanover National Bank of New York? A. I am. Q. In what capacity? A. There isn't any name for my position. Q. No official name for it? A. No. Q. Are you familiar with the books of the Hanover National Bank of New York? A. I am. Q. I will ask you to look at this journal. What book is that called—what is the name

of it? A. That is a register showing the accounts of banks under the—whose titles come under the—letters T to Z, national banks. Q. Does this ledger show the account between the Hanover National Bank and the First National Bank at Vinita, Indian Territory, in the year 1906? A. Six months of the year 1906. Q. Those entries in that book, by whom were they made, Mr. Wheeler? A. By various bookkeepers. Q. In the employ of the Hanover National Bank. And you say this is a book kept by that bank in the transacting of its banking business? A. This is an original book of record. Q. And in transacting its business with the correspondent bank of the First National Bank of Vinita, Indian Territory? A. It is. Q. Then that ledger which you have identified was one of the books used by the Hanover National Bank in transacting its bank business? A. It was. Q. And was it, or not, one of the books used in transacting its business with its correspondent banks? A. It was. Q. Was one of those correspondent banks the First National Bank at Vinita, Indian Territory? A. It was. Q. You said that it contained an account of the Hanover Bank and the First National Bank at Vinita, for six months of the year 1906? A. Yes, sir. Q. What six months? A. The last six months. Q. You may state, Mr. Wheeler, if it has not been shown, what your duties were in connection with the Hanover National Bank of New York. A. During this period, do you refer to? Q. During that period; yes. A. I was city manager; as such I had general supervision of the books of the bank, and of the clerical force. Q. You may state, then, what your duties were, Mr. Wheeler? A. I was city manager; as such I had general supervision of all the records and clerical force of the bank. Q. Is that all? A. That was enough. Q. What was included in the clerical force? A. 250 men. Q. Yes, sir; what was the duty of those men among other things? Did it pertain to the books? A. Yes; some of them were bookkeepers, some tellers, some assistants, etc. Q. Then, in the discharge of your duties, did you or not become acquainted with the books of the bank? A. I did. Q. And you have testified about this particular book? A. Yes. Q. Your knowledge as to the book and your means of identification are because of your duties with the bank? A. They are. Q. You may examine this book, Mr. Wheeler. A. Very well, sir. Q. What is the name of that book? A. That is a balance book; it shows the balances of all the accounts on that particular ledger, from the early part of 1906 to December, 1907. Q. Is that one of the books kept by the Hanover National Bank or not? A. It is. Q. And you can testify as to the identity of that book by the same means that you can as to the identity of the other book? A. I can. * * *"

Cross-examination:

"By Mr. Thompson: Q. Mr. Wheeler, you say the position you occupy with the Hanover National Bank has no name? A. That is correct. Q. You didn't keep these records yourself, or make these entries? A. I did not. Q. Not in any one of these books? A. I did not. * * *

"The Court: Q. I believe you said you had general charge of the bookkeepers who made these various accounts? A. Yes, sir. Q. Was that general charge such as—you can answer this question yes or no—such as enables you now to say whether or not these books are correct? A. Yes, sir. Q. Do they correctly state the amount which they purport to state? A. They do.

"Mr. Thompson: Q. You were not present at the time these entries were made? A. Do you mean—? Q. In these books? A. Looking over the bookkeeper's shoulders, that what you mean? Q. Yes. A. No, sir; I was not. Q. You didn't direct these entries be made? A. I did not. Q. They were made independently by the bookkeeper? A. They were. Q. You say you were city manager. What did you do as city manager? A. I saw that the work of the bank was done correctly, for one thing, so far as possible. Q. But you had to rely on the independent work of these parties for this work? A. Entirely; I didn't do it myself. Q. And you didn't direct the entries to be made? A. No, sir. Q. And didn't examine the items at the time they were made? A. No, sir. Q. To see that they were made correctly? A. No, sir."

Here was a witness whose position with the Hanover National Bank had no name. He called himself in his testimony "city manager." Outside of the questions put by the court, the testimony given by the witness simply amounted to an identification of the books as belonging to the Hanover National Bank. He was asked by the court if his position enabled him to testify as to whether the books were correct, to which he answered in the affirmative, and then testified that the books correctly stated the amounts they purported to state. The prosecution brought by the United States against Phillips was not a proceeding brought by or against the Hanover National Bank. Entries in its books were as to the defendant, as a matter of evidence, clearly hearsay. The question now arises: Did the testimony of Wheeler authorize the admission of the books as against Phillips for the purpose of showing the falsity of the entry made by him in the report of the Comptroller of the Currency?

The admission in evidence of books of account of private parties constitutes one of the exceptions to the rule of evidence which excludes hearsay testimony. The exception was born of necessity, and the courts have always required, in the absence of statutory provision, that before private books of account can be admitted in evidence, over the objection of the opposing party, some evidence must be introduced as to their trustworthiness. In the case of Bacon v. United States, 97 Fed. 35, 38 C. C. A. 37, Thayer, Circuit Judge, delivering the opinion of this court, used the following language:

"The books of the bank, when they were offered in evidence by the government, were further objected to by the defendant below on the ground that no testimony had been adduced to show that they had been properly kept. This objection was overruled, and error is assigned on account of that ruling. The government did prove, however, that the books in question were the books of the American National Bank, in which it had been accustomed to keep a record of its daily business transactions, and that the books had been kept according to what is known as the 'Boston System' of bookkeeping, by which system original entries are made on slips called 'debit' and 'credit' slips. The defendant, against whom the books were offered, was the chief executive officer of the bank, and as such actually had control and direction of its affairs while it was a going concern. Besides, the act of Congress under which the bank was organized in effect enjoined that its books should be truthfully kept, since section 5209 of the Revised Statutes, heretofore cited, made it an offense, punishable by imprisonment, for any officer or agent of the bank to make any false entry in its books. In view of these considerations, we are of opinion that a presumption existed that the books in question had been truthfully or properly kept, and that it was unnecessary to fortify that presumption with additional proof, when the books were produced, and proved to be the regular books of account of the bank. We have no fault to find with the rule which is enunciated in some cases that the books of a corporation cannot be used by the corporation without independent evidence showing that they are correct, for the purpose of establishing an indebtedness to itself on the part of its stockholders or directors. Rudd v. Robinson, 126 N. Y. 113, 26 N. E. 1046, 12 L. R. A. 473, 22 Am. St. Rep. 816. But we are unwilling to sanction the doctrine that in a proceeding against the president, of a national bank, to convict him of making a false report to the Comptroller of the Currency concerning its financial condition, the books of the bank, although properly identified as such, cannot be used by the prosecution as evidence to show its condition, without first producing other evidence to show that they have been truthfully kept, and are in all respects correct.

This latter rule would impose a burden upon the government which it should not be compelled to assume. Inasmuch as the act under which national banks are organized makes it the duty of all officers and employés of such institutions to make no entries in their books except such as are correct and truthful, the government should be entitled to rely upon the presumption that such duty has been faithfully performed until the contrary thereof is established."

It must not be forgotten, with reference to the language above quoted, that Bacon, the defendant, was the president of the American National Bank of Salt Lake City, and had been indicted for a violation of section 5209, Rev. Stat., with reference to the books of said bank, and that the bank books there offered in evidence were the books of a bank of which Bacon was the chief executive officer, charged with knowledge of all the transactions of the bank appearing in the books thereof, and that they were offered against him as proof, practically, of his own acts. We think the language of this court in the case cited should be limited to the question that was then before the court, and, thus limited, the rule enunciated was correct. We do not think, however, that the fact that the laws of the United States make it a criminal offense to make false entries in the books of a national bank makes the books of all national banks in a case like the one before us prima facie evidence of their contents simply upon their being identified as bank books. Notwithstanding the command of the statute that no false entries shall be made, the records of the courts show that they are frequently made. The witness Wheeler, although he said the entries in the books of the Hanover National Bank were correct, gave no evidence whatever to show that he had any knowledge upon the subject, or held such position in the Hanover National Bank that the court could say he ought to have knowledge regarding them. He had nothing to do with the keeping of the books, nor with the financial transactions which resulted in the entries appearing in them. The two bank books were offered in solido, and just how the account between the Hanover National Bank and the First National Bank of Vinita appeared therein the record does not show. The decisions of the courts upon the admissibility of book entries and account books are not harmonious, but the rule that must obtain in the federal courts is plain.

In the case of Insurance Co. v. Weide, 9 Wall. 677, 19 L. Ed. 810, it appears that Charles Weide and Joseph Weide, of Minnesota, brought suit in one of the state courts of that state against the Ætna Insurance Company on a policy of insurance to recover $10,000 upon a stock of goods lost by fire within the conditions of the policy. The suit was duly removed to the federal court. Both the plaintiffs in the trial court were witnesses to prove the value of the goods in the store lost by fire. All the books of account were burned except two daybooks and a ledger. The daybooks covered entries of sales and purchases in the store from 1865 down to the day of the fire, which was on the 22d day of February, 1867. The ledger began the 1st of October, 1866, and contained all merchandise accounts posted from the daybooks, also coming down to the time of the fire. The witnesses identified the daybooks and ledger, and testified that these books were

kept by them, as they had no clerk; that they were the books kept in their business, and that they were correct; that the entries in the day-books were the original entries of purchasers and sales; that they could not state from recollection the amount or value of the stock on hand at the time of the fire, nor at the time of taking the last inventory in February, 1866, nor by the purchases and sales after that inventory. The daybooks and ledger were offered and admitted in evidence. Mr. Justice Nelson, in delivering the opinion of the court in the case cited, said:

"There can be no doubt but the daybooks and ledger, the entries in which were testified to be correct by the persons who made them, were properly admitted. They would not have been evidence, per se, but with the testimony accompanying them all objections were removed."

The case of Chaffee & Co. v. United States, 18 Wall. 516, 21 L. Ed. 908, was a case brought by the United States against Chaffee & Co. to recover penalties incurred for the alleged violation of section 48 of the Act of June 30, 1864 (13 Stat. 240, c. 173), to provide internal revenue to support the government. That act provided that any person who should have in his custody or possession any goods, wares, or merchandise, subject to duty, for the purpose of selling the same with the design of avoiding payment of the duties imposed thereon, should be liable to a penalty of $500. Chaffee & Co. were distillers at Tippecanoe, a small town upon the Miami Canal, which traversed the state of Ohio from Cincinnati, on the south line of the state, by a course north and south, to Toledo, in the north. The custom of Chaffee & Co. was to ship whiskies in both directions. Going north, such whiskies had to pass through a place called Piqua, which was the first place on the canal at which toll was payable when the vessel was going from Tippecanoe in the direction named. Going south, towards Cincinnati, the whiskies had to pass through Dayton, the first place at which toll was payable when the vessel was going from Tippecanoe south. There was no other distillery at Tippecanoe. The Miami Canal, on which these whiskies were transported, had been made and for some years was managed by the state of Ohio. A statute for the regulation of the navigation thereof, and for the collection of tolls, enacted that no boat should be permitted to pass on it unless the master had first obtained a clearance for each voyage from the collector of tolls, which clearance the collector nearest the place at which the boat began her voyage was required to issue. To enable the collector to issue clearances that should truly represent what cargo was on board, the act made it obligatory on the master to exhibit to the collectors a just and true account or bill of lading of each and every article of property on board, when the boat should depart on her voyage, or which should be taken on afterwards, and, further, to insure accuracy, every collector receiving a bill of lading might require the master to verify it by his oath. Though the canal had been originally managed by the state, it was not so managed at the time when the whiskies of Chaffee & Co. were transported. The state had leased it.

On the trial, the defendants having proved that during the time

embraced in the controversy they had paid taxes on full 6,045 barrels of whisky made by them during that time, the government, in order to show that the defendants had in their custody or possession dutiable whisky, for the purpose of selling the same with the design of avoiding payment of duties imposed thereon, offered in evidence the books of the collectors at Piqua and Dayton, which the collectors produced, to show by different certificates in them, on which clearances had been granted at Dayton and Piqua, the collection offices nearest to Tippecanoe, at which place, as already said, Chaffee & Co. were the only distillers, that 200,000 gallons more whisky had been moved from the said place than duties were paid on. The collectors at Piqua, Dayton, and Cincinnati were examined. They had little personal knowledge of any facts bearing on the controversy. The handwriting of Kaufman, the young man who made some entries at Dayton, and who was dead, was proved, and the grandson of Brown, who made some others, was produced and sworn. But the government examined none of the captains whose names were signed to the several certificates in the books at Dayton and Piqua, as to the genuineness of their signatures, nor was proof given of the handwriting or death of any of them. The collector at Cincinnati did not testify from any knowledge of his own that his books contained true records of what whiskies had arrived. Some, but not all, of the captains were examined as witnesses, and testified to the carriage of whiskies from Chaffee's distillery on their boats, at dates corresponding and of quantities corresponding to their several certificates, respectively. The defendants objected to the reception of the books, on the ground that it was hearsay and res inter alios acta. But the evidence was admitted, not as evidence that whisky came from or belonged to the defendants, but only as competent to show that a given quantity passed a certain point on a given day, and, if the government did not connect this whisky with the defendants, the testimony would be stricken out. The defendants excepted. The evidence was never afterwards stricken out. Mr. Justice Field, in delivering the opinion of the Supreme Court to the effect that the books were improperly admitted, used the following language:

"The books were not public records. They stood on the same footing with the books of the trader or merchant. The fact that the lease was from the state did not change the character of the entries made by the collectors, who were simply agents of the lessees, and not public officers of the state. Their admissibility must therefore be determined by the rule which governs the admissibility of entries made by private parties in the ordinary course of their business. And that rule, with some exceptions not including the present case, requires, for the admissibility of the entries, not merely that they shall be contemporaneous with the facts to which they relate, but shall be made by parties having personal knowledge of the facts, and be corroborated by their testimony, if living and accessible, or by proof of their handwriting, if dead, or insane, or beyond the reach of the process or commission of the court. The testimony of living witnesses personally cognizant of the facts of which they speak, given under the sanction of an oath in open court, where they may be subjected to cross-examination, affords the greatest security for truth. Their declarations, verbal or written, must, however, sometimes be admitted, when they themselves cannot be called, in order to prevent a failure of justice. The admissibility of the declarations is in such cases limited by

the necessity upon which it is founded. We do not deem it important to cite at length authorities for the rule and its limitation as we state it. They will be found in the approved treatises on evidence and in the numerous cases cited by counsel on the argument."

In Reyburn v. Queen City Savings Bank & Trust Co., 171 Fed. 609, 96 C. C. A. 373, Gray, Circuit Judge, in delivering the opinion of the Circuit Court of Appeals of the Third Circuit, after holding certain entries in bank books admissible, said:

"Of course judicial discretion in every such case is appealed to, to see that such testimony, when offered, has been safeguarded by such an environment of circumstances as will give it the requisite circumstantial trustworthiness. The entries accordingly must have been made in the regular course of business, and must be testified to, if possible, by the entrant, who must be shown to have been the one whose ordinary business it was to make such entries, and that such entries are to all'intents and purposes, or as nearly as possible, original entries, and such as the business of the bank requires, and upon the faith of which such business is transacted."

As stated by the Supreme Court, all of the approved treatises on Evidence lay down the rule as stated in these decisions. If this rule obtains in civil cases, it should not be relaxed in criminal cases. It results, therefore, that the books of the Hanover National Bank were improperly admitted in evidence, in the absence of the testimony of some person who either had some knowledge of the correctness of the entries made, or some knowledge of the original transaction upon which the entries were founded, and in the absence of testimony showing that the person or persons who possessed such knowledge were either dead, insane, or beyond the jurisdiction of the court.

[9] So far as the error assigned as to the admission of the expert testimony bearing upon what the books showed, it may be stated that it is proper for an expert accountant to give a summary of books and documents, where the items are multifarious and voluminous, and of a character to render it difficult for the jury to comprehend material facts without the aid of such statements. Wigmore on Evidence, § 1230. We think, however, that the true rule is that before such expert testimony may be given the books or documents must be public records, or, if they are private books of account or documents, that sufficient evidence must first be given to admit the books or documents themselves in evidence, unless the books or documents are admitted to be correct. Otherwise, items in books of account might be given in evidence through the testimony of an expert accountant, when the account books themselves would not be admissible. This would seem to be wrong in principle and dangerous in practice.

For the error in the admission of the books of the Hanover National Bank, and in allowing an expert accountant to testify as to what they showed, in the absence of testimony which would allow the books themselves to be admitted, the judgment of the court below is reversed, and the case is remanded to the United States District Court for the Eastern District of Oklahoma, with directions to grant a new trial.